J-S43045-14

2014 PA Super 252

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| IAN THOMAS SEAGRAVES, | |
| Appellant | No. 2758 EDA 2013 |

Appeal from the Judgment of Sentence entered September 20, 2013,
in the Court of Common Pleas of Monroe County,
Criminal Division, at No(s): CP-45-CR-0000298-2009

BEFORE: GANTMAN, P.J, ALLEN and FITZGERALD,* JJ.

OPINION BY ALLEN, J.:                    **FILED NOVEMBER 06, 2014**

In this appeal, we address a challenge to the discretionary aspects of a sentence imposed following a re-sentencing hearing in accordance with ***Miller v. Alabama***, ___ U.S. ___, 132 S.Ct. 2455, 183 L.Ed. 407 (2012), and the Pennsylvania Supreme Court's decision in ***Commonwealth v. Batts***, 66 A.3d 286 (Pa. 2013).[1]  We affirm.

_____

[1] Appellant filed his appeal from the order denying his post-sentence motion. In a criminal case, "when timely post-sentence motions are filed, an appeal properly lies from the judgment of sentence made final by the denial of the post-sentence motions." ***Commonwealth v. Bradley***, 69 A.2d 253, 254 (Pa. Super. 2013).

*Former Justice specially assigned to the Superior Court.

Ian Thomas Seagraves ("Appellant"), then seventeen, and his adult co-defendant, Shawn Nicholas Freemore ("Freemore"), then nineteen, planned to lure the victim to an obscure location under a bridge. Although the victim believed he was meeting Freemore for a sexual encounter, according to Freemore, "The plan was to meet him. Scare him. Kill him." *See* N.T., 9/16/11, at 79. As planned, once the victim was present, Appellant jumped the victim, stabbing him in his throat. While the victim ran and pled for mercy, Appellant and Freemore caught up to him and forced him into the woods. Appellant and Freemore then stabbed the victim approximately forty-five times, and slashed him with a meat cleaver. They then attempted to hide the victim's body under the snow. After leaving the scene, Freemore returned and rifled through the victim's pockets, taking the victim's car keys, as well as a digital recorder on which the victim had recorded choir music he performed for a local church.

After the victim was reported missing, the local authorities found his car, and their investigation led them to Freemore. At first Freemore denied recently meeting with the victim. He then informed them he killed the victim and acted alone. In his final version of events, Freemore told the authorities that he planned and committed the murder with Appellant, and that Appellant still possessed a DVD that he and Freemore had taken from the victim's car. Following a search of Appellant's home, the police recovered the stolen DVD. Authorities ultimately charged Appellant and Freemore with criminal homicide and related crimes.

A joint jury trial began on September 13, 2011. As part of the evidence, the Commonwealth introduced notebooks and digital recordings made by each defendant. The Commonwealth first introduced notebooks found in Freemore's car in which each defendant "set his crime to verse." N.T., 9/13/11, at 38. The two later used the victim's digital recorder to set their words to music, and sing them as a rap song.[2] The Commonwealth

_____

[2] A Pennsylvania State trooper read the following "lyrics" of Appellant's rap song at the resentencing hearing:

> It was cold, but I wasn't alone trippin, waiting for the kid to commence with throat rippin. My heart skipping as I'm waiting under the dark bridge, my friend luring him down here, we gonna kill this kid. When they come under, I was sitting in the dark cover. He sat next to me, and I went and stabbed this mothafucka. Right into his neck, and I stabbed him in the head. He choked, but started running. His bitch ass wasn't dead. My homie chased him down the street and ran towards the light, but nobody saw him. It was in the middle of the night. His fright was showing. The mothafucka started pleading. He was all light-headed because his throat was all bleeding. I'm seeing so much blood as we led him into the woods. We were killing some faggot in my own neighborhood. He wanted to fuck my friend, but instead we fucked him. I stuck him in the fuckin throat, so that said something. From all the running my lungs were starting to hurt. We stabbed him again, and we watched the blood squirt. Through his shirt, and I stabbed him in the face. He was still alive but dying at good pace. He was begging and begging. Please, man, let me go. I'll never say nothing, and nobody will ever know. But Skippy said no, and so I left the blade in his neck, destroyed his radio, and the fucka had no respect. Trippin him out at something at first thought, scaring his dying ass with some reverse talk. I

*(Footnote Continued Next Page)*

played these recordings for the jury. Finally, the Commonwealth introduced evidence to demonstrate that, following the murder, Appellant changed his name on a social media site to "Throwt Stabba."

On September 21, 2011, the jury convicted Appellant and Freemore of first-degree murder, conspiracy, and tampering with evidence. On December 12, 2011, the trial court sentenced Appellant to the mandatory term of life without the possibility of parole for his murder conviction, and a consecutive term of eight and one-half to twenty years of incarceration for the remaining convictions.[3]

Following the denial of his post-sentence motions, Appellant filed a timely appeal to this Court. In an unpublished memorandum filed on July 16, 2013, this Court, although rejecting Appellant's substantive claims, vacated Appellant's mandatory life imprisonment sentence and remanded for resentencing in accordance with the **Miller** and **Batts** decisions.

On remand, the trial court appointed new counsel for Appellant, and conducted a re-sentencing hearing on September 20, 2013. At the conclusion of this hearing, the trial court re-imposed a sentence of life

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯

> was kicking him in the skull to make sure he was gone,
> stabbed him in the side and spine and in his throng [sic].

N.T., 9/20/13, at 20-21.

[3] The trial court imposed the same sentence upon Freemore.

imprisonment without the possibility of parole for the murder conviction, and the same consecutive term for the remaining convictions. This appeal followed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises the following issue on appeal:

> I. Whether the [trial] court abused its discretion when it sentenced Appellant, who was a juvenile at the time of the crime, to life without parole without properly taking into consideration mitigating factors listed in **Miller v. Alabama**.

Appellant's Brief at 6.

As noted above, Appellant challenges the discretionary aspects of his sentence. This Court has summarized:

> Appellant challenges the discretionary aspects of sentencing for which there is no automatic right to appeal. This appeal is, therefore, more appropriately considered a petition for allowance of appeal. Two requirements must be met before a challenge to the judgment of sentence will be heard on the merits. First, the appellant must set forth in his [or her] brief a concise statement of matters relied upon for allowance of appeal with respect to the discretionary aspects of his [or her] sentence. Pa.R.A.P. 2119(f). Second, he or she must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code. 42 Pa.C.S.A. § 9781(b)[.]
>
> The determination of whether a particular case raises a substantial question is to be evaluated on a case-by-case basis. Generally, however, in order to establish that there is a substantial question, the appellant must show actions by the sentencing court inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing process.

*Commonwealth v. Marts*, 889 A.2d 608, 611-12 (Pa. Super. 2005)

(footnote and citations omitted).

Appellant's Pa.R.A.P. 2119(f) statement reads, in pertinent part, as

follows:

> In the instant case, the [trial] court abused its discretion by re-sentencing Appellant without properly considering mitigating factors due to Appellant's status as a juvenile at the time of the commission of the offense. The U.S. Supreme Court outlined a number of factors that a sentencing court must consider prior to imposing a life sentence without the possibility of parole on a juvenile. The [trial] court improperly relied solely on factors derived from a decertification hearing, rather than conducting a searching inquiry into the factors it had to consider. As a result, the sentence imposed constituted a manifest abuse of discretion.

Appellant's Brief at 11.

As recognized by this Court in *Commonwealth v. Dodge*, 77 A.3d 1263 (Pa. Super. 2013), prior decisions from this Court involving whether a substantial question has been raised by claims that the sentencing court "failed to consider" or "failed to adequately consider" sentencing factors "has been less than a model of clarity and consistency." *Dodge*, 77 A.3d at 1272 n.8. Nevertheless, we hold that Appellant's claim that the trial court improperly relied on factors derived from a prior decertification hearing, when resentencing in accordance with the *Miller* and *Batts* decisions, raises a substantial question. We will therefore proceed to address the merits of Appellant's claim.

"In reviewing a challenge to the discretionary aspects of sentencing, we evaluate the court's decision under an abuse of discretion standard." *Dodge*, 77 A.3d at 1274. When, as here, the trial court has the benefit of a pre-sentence report, we presume that the court was aware of relevant information regarding the defendant's character and weighed those considerations along with any mitigating factors. *Commonwealth v. Griffin*, 65 A.3d 932, 937 (Pa. Super. 2013).

In support of his claim on appeal, Appellant asserts that, while the trial court "indicated that it had considered mitigating factors prior to re-imposing [a life sentence without possibility of parole] on Appellant, . . . the factors the court said it considered all came from the decertification hearing held earlier in this matter." Appellant's Brief at 10. According to Appellant, the trial court's "relying solely on the factors derived from the decertification hearing falls short of the mandate outlined in *Miller v. Alabama*, [*supra*], and thus violates Appellant's constitutional right to be free from cruel and unusual punishment." *Id.* Our review of the resentencing transcript refutes Appellant's claim.

At the beginning of the re-sentencing hearing, the trial court recognized that it had to consider more than just evidence from the decertification hearing. The following exchange occurred between the trial court and defense counsel:

> THE COURT:  Well, we have two things.  One of them was a decertification - -

[DEFENSE COUNSEL]:  Right.

THE COURT:  - - hearing that was held before Judge Vican together with his findings that he made at that time, and that touches upon a lot of the same areas that you would look at under the new standard and under what [our Supreme Court] told us to look at essentially in *Batts*.

[DEFENSE COUNSEL]:  Yes.

THE COURT:  And so I've reviewed that.  But I would like from your point of view rather than - - since this is a resentencing, I would like to hear from your point of view whether you have any testimony, any additional information for me that touches upon those very specific areas.

[DEFENSE COUNSEL]:  No, your Honor.  All I have is the arguments that were given in the past.  I don't think anything else has changed.  We discussed possibly having another evaluation done, but I'm not sure if that would be relevant at this point because things haven't changed that much since the last time [Appellant] was sentenced.

I do believe that you should take into consideration all of the things that were brought up at that hearing. Whether it was remanded to juvenile court or not, the issues that were presented at that hearing are still relevant, and I think you should take those into consideration for sentencing.

I should point out that *Miller* also talks about the ability to deal with outside pressures, and I think that [Freemore] in this matter should be taken into consideration as well as his maturity and whether he led [Appellant] to do these sort of situations.  [sic]  And I think you should take into consideration the environment and the lack - - the ability of [Appellant] to get himself out of that sort of situation.

There are other issues involved, or course.  We'll deal with those as the appeal process continues.  Right now the main issue is whether [Appellant] is going to be the same 50 years from now when we're long gone and the world is much, much different.  And I think that's one of the reasons that the Supreme Court made that decision as well.

You know, someone who was sentenced in 1960 who is now in his 70s and still sitting in jail is not necessarily the same person he was when he was 17, and 50 years from now who knows what [Appellant] is going to be like.

All we're asking is for the possibility of parole. A future parole board might deny it, but then they might have much more information at their hand [sic]. I think that's why *Miller* is such an important case because by then they will have the background information of how [Appellant's] life has progressed in the next who knows how many years before they look at that.

To block that off at this stage is to prevent future courts and future judges from looking at this with an eye on how [Appellant's] life has changed, and I think that's important, and I think that's why *Miller* is such an important case. And I'm asking you to do that more than anything else, to leave the option open for the future.

[Appellant] may never get parole. He may constantly spend the rest of his life in jail, and they may deny it over and over again. But to close that door on him I think is against what the constitution stands for based on what *Miller* said.

And that's pretty much my main argument. I'm just saying let's leave the door open, Judge. This is a horrible incident. I'm not going to deny that. And the district attorney and all the witnesses are going to try to make it sound absolutely terrible, and I'm not going to deny it's absolutely terrible.

But he was a juvenile at the time. The standards are different, and I am asking you to look at [Appellant's] background based on what's already in the file, what's already in the record, and use that to decide to keep the door open for him sometime in the future just in case.

N.T., 9/20/13, 4-8.

Defense counsel then asked Appellant if he would like to address the trial court, and Appellant did so:

- 9 -

[APPELLANT]: I mean, you can believe what you want. But the years that I've been in prison, even since juvenile since being a juvenile, you know, I've been through a lot of things in my life. You know, I've always had kind of the same thought process, but I've learned a lot of things.

You know, I got my GED upstate. You know what I'm saying? I had basically a lot of downtime to really evaluate my life and think it over a lot of, you know, bonds I made with people I probably shouldn't have.

And, you know, I pretty much guarantee that if I would be released right now I would never be in a situation like this, which I know is never going to happen. But, you know, it's just for you to decide.

*Id.* at 8.

Next, the trial court heard from several of the victim's family members. The Commonwealth then presented its argument to the trial court:

*Miller v. Alabama*, as summarized in [the] *Batts* decision clearly indicates that you have the authority to sentence [Appellant] to life without parole. It says clearly in the *Batts* decision, "*Miller* neither barred imposition of a life-without-parole sentence on a juvenile categorically nor indicated that a life sentence with[out] the possibility of parole could never be . . . imposed on a juvenile." "Rather, *Miller* requires only that there be judicial consideration of the appropriate age-related factors set forth in that decision prior to the imposition of sentence."

And then in *Batts* there's actually 14 separate factors that are laid out. The [d]efendant's age [at the time he or she committed the crime] is the first one. [In *Miller* and its companion case], you're talking about kids on the lower end. You're talking 14-year-olds, that sort of thing.

[Appellant] was 17 years and some odd months with a birth date of January 22nd, 1992, so he was 17 years plus I think two or three months, if I remember correctly. His

- 10 -

co-Defendant had just turned 19, so they were close in age, [Freemore], so they were close in age.

So when you look at those cases that talk about how children are different and all that, the focus on those - - what made those cases maybe more compelling factually was the younger age [of the defendant]. And then you got to look at the involvement of those juveniles. Many of them were more like murders in the second degree, felony murders that went awry, so there was a mandatory life sentence for that.

[Appellant's] conduct was totally out of the ballpark in terms of active participation, which is another factor that we'll get to, so I don't believe the age should be a factor that would militate in [Appellant's case] of any kind of parole at 17 plus years.

The capacity for change, this is time to establish that. This is the time - - that's another factor in **Batts**, in **Miller**. What's [Appellant's] capacity for change? I haven't heard any evidence that he had demonstrated a capacity for change.

In fact, the argument of the Commonwealth would be [to] warehouse [Appellant] as long as you can because you're going to [save] lives along the way by doing that as opposed to letting him see the light of day again, and we'll get to that.

The circumstances of his crime, the extent of his participation, and whether he was the subject of any peer pressure are all kind of related to the facts of the case.

The facts of the case were summarized by Judge Vican when he did the original sentence on December 12th, 2011. On page 9 of that transcript, he said, "The horrendousness of this, the lack of compassion, the lack of human sympathy for another person I think is justified in allowing the [sentencing] recommendation to be imposed as it is given. We will issue the following Order." It was a life plus sentence.

He was struck, [Judge Vican] was, as the jury was, as anyone who has looked at the facts of this case was, by the fact that there was such a long period of planning that

went into this. This wasn't a conglomeration of factors that brought [the victim] in his circle, in [Appellant's] circle, and then something went awry, and it resulted in the death of [the victim].

This was the plan, the plan that [Freemore] told Trooper Sebastianelli and Trooper Vanlouvender was to go ahead and get [the victim], scare him and kill him. I mean, that was part of it, and they wanted to do that. They were equal partners, and they wanted to write about it, and they wanted to sing a song to it.

N.T., 9/20/13, at 12-15.

The Commonwealth then recounted the facts surrounding Appellant's and Freemore's plan, and its execution, ultimately resulting in the victim's death. Next, the Commonwealth referenced how, after the murder, Appellant "composes a song commemorating what he did, his role in it[,]" and how the "Commonwealth used each line of [Appellant's] song and [Freemore's] song to match it up with the physical evidence at the scene. It was flawless." *Id.* at 17. A Pennsylvania state trooper then read the "lyrics" of Appellant's rap song into the record,[4] and the recording was played for the trial court.

The Commonwealth concluded its argument as follows:

But I think the Court has received the clear intent of [Appellant], his level of participation, the fact that he wasn't subject to peer pressure. This was something that he strived for, and he accomplished his designs.

---

[4] *See* n.2, *supra*.

And in light of the fact that there's a paucity of any of the other factors such as capacity for change and his amenability for rehabilitation, I haven't heard any of that established today. This was the chance for the Court to consider such things if they, in fact, happened.

In fact, [Appellant's] own statements [at sentencing] were all about him and not a shred of remorse expressed for what he did to [the victim], so to talk about change. I ask that you impose the sentence you can, which is life without the possibility of parole, and those other ancillary charges should also run consecutive. Thank you.

N.T., 9/20/13, at 22.

In response, defense counsel stated:

[DEFENSE COUNSEL]: Only that to address the capacity for change, Your Honor, [Appellant] has talked about how he has done at the jail. He hasn't had any problems at this time. He's still young. There's a lot of room for capacity for change, and to ask that we speculate over what might happen over the next 30, 40, 50 years is asking for a bit too much.

He has not had any problems since his time in jail, and he talked about how he got his GED. He's working to make his life better. Those to me show some signs of capacity to change. We won't know for certain for a long time which is why I'm asking that you do not close the door.

*Id.*, at 23.

After considering the arguments of counsel, the trial court stated the

following:

THE COURT: This is probably one of the most - - well, we have a lot of troubling cases. But whenever you have someone who is a juvenile who commits this kind of an offense, it becomes even more troubling because you have to look and think what the heck happened during those formative years that caused this to happen.

- 13 -

And I think that's why we have decertification proceedings in part because it gives the Court and the [defendant] and the prosecution an opportunity to look at all those factors.

And I looked through what had been heard by Judge Vican, and I thought it was interesting. I looked at an independent psychiatric evaluation that was done and admitted back then, and it struck me when I was looking at the *Batts* factors that the summary in the conclusions of this evaluation found [Appellant] to be relatively mature for someone his age and intelligent. It found him to not have a diminished mental capacity at the time of the evaluation. It found him to have a moderate degree of sophistication. It found that he would not be rehabilitable - - that's a difficult word to say - - rehabilitable in a juvenile court jurisdiction at that point. And all of those are part and parcel of what I believe *Batts* wants you to look at when you are making these decisions under the *Miller* case.

It's clear from - - to me at least from a review of the file, and I had not seen the autopsy report, but I looked at it and saw actually the force of each of these wounds and what they would require and how it essentially pierced various organs of the [victim]. And I can only begin to imagine the horrific experience that [the victim] had on that evening and as illustrated in that song, the fear that he must have been feeling and the distress. It's a crime that shows no compassion for life, none whatsoever, just a coldness and a calculation that is just beyond what you usually see.

I do not believe, [Appellant], that you fall into these categories that I'm looking at under the *Miller* and *Batts* decisions that I need to consider and have considered by reviewing this file and listening to what was said today, that your age at the time of the commission of this horrible, horrible murder was almost adulthood. You were very close.

And I agree with [the Commonwealth] because I looked at that, and I wondered what are the ages of these people in the other cases, and they were at the other end of the juvenile spectrum, not at the [sic] close to [the] adult end.

- 14 -

When I look at some of the other factors they talk about, emotional maturity and development, peer pressure, you know, ability to deal with police, capacity to assist attorney, by the evaluation, you're very intelligent and more mature than your age level would have indicated. I see no reason based on all of these factors to sentence you to anything other than what you were sentenced to by Judge Vican.

And although at this point in time I have the option of life with parole or life without parole, in my estimation, and after reviewing all of these factors and in addition the aggravating circumstance that was provided for in the PSI that at the time of this you were actually on juvenile probation when these offenses were committed, I see no reason to sentence you to anything other than life without the possibility of parole.

N.T., 9/20/13, at 23-26.

The above comments at sentencing unequivocally establish that the trial court did not base its decision to re-impose a life without the possibility of parole sentence solely on information culled from the prior decertification proceeding. Moreover, the trial court gave Appellant the opportunity to present any additional information regarding his "capacity to change," his amenability to treatment, and/or his potential for rehabilitation. Other than informing the trial court that he obtained his GED, Appellant failed to do so. Finally, because the trial court had the benefit of a presentence report, we presume that the court was aware of relevant information regarding the defendant's character and weighed those considerations along with any mitigating factors. **Commonwealth v. Griffin**, **supra**.

Citing the pre-sentence report it possessed at resentencing, the trial court further explained its reasoning in its Pa.R.A.P. 1925(a) opinion:

Because Appellant was seventeen [when he murdered the victim], we find that the "penological justifications for imposing the harshest sentences on juvenile offenders" [*Miller*, 132 S.Ct. at 2465,] were not as diminished in the case at bar as they are in cases where the minor defendant is younger.

Relatedly, we consider Appellant's prior criminal history as it relates to his potential for rehabilitation. Appellant has a lengthy juvenile record. His involvement in the juvenile system dates back to a residential structure fire occurring on July 12, 2005. On March 23, 2006, Appellant admitted guilt to one count of burglary and one count of arson in connection with this incident, both of which would have been graded as felonies of the second degree if Appellant were an adult at the time of their commission. One month prior, in February of 2006, Appellant admitted to possessing drug paraphernalia on school property in August of 2005, which would have been an ungraded misdemeanor if Appellant had been an adult. In connection with these infractions, Appellant was placed at the Abraxas Youth Center, a residential treatment facility. Prior to this placement, Appellant had accumulated forty[-]five disciplinary infractions during the 2004-2005 school year. After his placement, Appellant violated the conditions of a subsequent term of probation by returning positive urine screens on three tests and receiving a citation for disorderly conduct. At the time of the murder of [the victim], Appellant was facing prosecution for providing false urine, a charge which was dropped in light of the latter, more serious charges brought against Appellant in the case at bar. Based on Appellant's status as a repeat juvenile offender, we find he possesses a limited, if any, capacity for change.

The brutal circumstances of [the victim's] death, the extent of Appellant's participation therein, and the apparent lack of familial or peer pressure to participate also inform our Judgment of Sentence. The case against Appellant contained overwhelming evidence of planning and lying in wait for the victim. The victim died as a result of a willful, premeditated plan devised by Appellant and [Freemore]. As articulated by Freemore to Trooper Craig VanLouvender, the plan, in its entirety, was "to meet him, scare him, kill him." This plan was brutally executed to the

- 16 -

point that the victim was savagely tortured to death by the two men. And although both men participated in delivering the numerous and fatal knife wounds, Appellant was the individual who laid in wait for the victim and delivered the initial blow, stabbing the victim in his throat. In *Miller*, Justice Breyer authored a concurrence, opining that the only juveniles who may constitutionally be sentence[d] to life without parole are those convicted of homicide offenses who kill or intend to kill, differentiating such offenders from those who were convicted of murder as a result of participation in a felony. In the case at bar, there is no indication that Appellant was anything other than a knowing and willing participant in the senseless, premeditated and horrendous slaughter of [the victim]. Accordingly, we find further support in ordering Appellant to serve a sentence of life imprisonment without the possibility of parole.

Additionally, there is no indication that Appellant's family, home or neighborhood life was so dysfunctional as to create an environment out of which Appellant could not extricate himself. Although Appellant's attorneys [sic] have made several allusions to Appellant's less than ideal upbringing, no demonstrative facts were ever placed on the record. Further, these generalized assertions were largely negated by Appellant's own statement in his [pre-sentence] report regarding his home life. "When asked to describe his childhood, [Appellant] responded 'It definitely wasn't bad,' adding that 'My parents went through their trials and tribulations but they got through it." [Appellant] denied suffering any instances of abuse and indicated that all of his material and emotional needs were fulfilled.

Relatedly, there is no evidence demonstrating that Appellant had any past exposure to violence, other than to the Jugalo subculture in which he voluntarily immersed himself. Appellant and Freemore were both self-described Jugalos. At trial, Appellant described a Jugalo as an individual who is a fan of Psychopathic Records, a horror core or horror rap music label where the lyrics are based on murder, violence and sex. In connection with his identity as a Jugalo, Appellant would hang out with other Jugalos, listen to this music, emulate the music through writings of his own, and carry a butcher's knife around in his back pocket. Due to the voluntary nature of these

activities, we do not find Appellant's past exposure to violence to be a mitigating factor.

Finally, there is no indication that Appellant was unable to deal with police or assist his attorneys. Under **Miller**, a sentencing court must consider these factors in order to determine whether Appellant "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth . . ." At trial, Trooper James Wheeler testified regarding the initial police interview of Appellant. According to Trooper Wheeler, Appellant seemed calm, friendly and interested in speaking with the police. Trooper Wheeler assured that both Appellant and Appellant's mother understood Appellant's rights in speaking with him. As a further assurance, Trooper Wheeler allowed Appellant to consult privately with his mother before he endeavored to question Appellant about [the victim]. At some point, the line of questioning became "a little more in depth than first originally intended" and Appellant and his mother indicated their desire to terminate the interview. Based on Trooper Wheeler's testimony regarding this exchange, and the lack of any other evidence demonstrating that Appellant's youth may have rendered him vulnerable to the police or prosecutors or incapable of assisting his attorneys, we do not find these factors present mitigating circumstances.

Not all of the **Batts** factors militate in favor of imposing a sentence [of] life without the possibility of parole. Under **Miller** this Court must "consider mitigating circumstances before imposing the harshest penalty." Appellant's mental health and drug and alcohol history are such circumstances. As to his mental health history, Appellant [claims to have been] diagnosed bipolar and at the time of trial was prescribed Seroquel and lithium in connection with this condition. Appellant is additionally diagnosed with Attention Deficit Hyperactivity Disorder and has been prescribed amphetamines since he was four years old. At trial, Appellant testified to crushing and snorting the amphetamines as opposed to ingesting the medicine according to the prescribed manner. The other illegal drug activity to which Appellant testified included the daily smoking of marijuana and the near daily use of hallucinogenic drugs such as lysergic acid diethylamide, psilocybin mushrooms, and dextromethorphan, an active

ingredient in cough suppressants. Appellant's mother testified to her concern over Appellant's drug use. Due to this concern, Appellant's mother enrolled Appellant in an impatient drug treatment program at the Lehigh Hospital in January of 2009. Upon discharge from this program, Appellant resumed his drug use. Although this Court is sympathetic to Appellant's unfortunate history, it does very little in the way of persuading us to impose a sentence anything other than life without the possibility of parole. These mitigating circumstances do not outweigh the other ***Batts*** factors analyzed above.

Because this Court gave adequate consideration to the relevant factors listed in ***Miller*** and thereafter in ***Batts***, we disagree with Appellant's contention that we abused our discretion in sentencing him to life without the possibility of parole.

Trial Court Opinion, 11/27/13, at 4-8 (footnotes and citations omitted). After carefully reviewing the record, we concur with the trial court's assessment of Appellant's claim on appeal.

Neither the decision in ***Miller*** nor ***Batts*** categorically prohibits the re-imposition of a life without the possibility of parole sentence. In ***Batts***, our Supreme Court explained:

[The United States Supreme Court in ***Miller***] did not entirely foreclose the imposition of a life-without-parole sentence on a juvenile offender; rather the majority stated the occasion for such a punishment would be "uncommon," and, in any event, must first "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." [***Miller***], at ____, 132 S.Ct. 2469.

\*\*\*

Thus, the majority explained that its decision "mandates only that a sentence follow a certain process-considering an offender's youth and attended characteristics–before

- 19 -

imposing a particular penalty. [**Miller**], at ___. 132 S.Ct. at 247.

Justice Breyer, joined by Justice Sotomayor, filed a joining concurrence, opining that "[t]he only juveniles who may constitutionally be sentenced to life without parole are those convicted of homicide offenses who kill or intend to kill," differentiating such offenders from those who were convicted of murder as a result of participation in a felony. **Id.** at ___, 132 S.Ct. at 2476.

**Batts**, 66 A.3d at 291 (footnote omitted).[5]

Finally, when considering "appropriate age-related factors" upon re-sentencing, our Supreme Court quoted with approval our discussion of **Miller** in **Commonwealth v. Knox**, 50 A.3d 732, 745 (Pa. Super. 2012):

[A]t a minimum [the trial court] should consider a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation.

**Batts**, 66 A.3d at 297.

---

[5] Our Supreme Court further noted that a newly enacted statute, 18 Pa.C.S.A. section 1102.1, "applies only to minors convicted of murder on or after the date **Miller** was issued (June 25, 2012)." **Batts**, 66 A.3d at 293. Because Appellant was convicted of murder in 2011, the new statute is inapplicable.

Because our review of the record readily reveals that the trial court considered these factors before re-imposing the sentence, we affirm Appellant's life sentence without the possibility of parole.

Judgment of sentence affirmed.

President Judge Gantman joins the opinion.

Justice Fitzgerald files a dissenting opinion.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/6/2014