J-S91031-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ZHAIRE N. DEKEYSER | : | |
| | : | |
| Appellant | : | No. 675 MDA 2016 |

Appeal from the Judgment of Sentence March 22, 2016
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0004545-2014

BEFORE: FORD ELLIOTT, P.J.E., RANSOM, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:          **FILED FEBRUARY 14, 2017**

Appellant Zhaire N. Dekeyser appeals from the judgment of sentence entered by the Court of Common Pleas of Dauphin County after a jury convicted Appellant of first-degree murder, robbery (commits serious bodily injury), and conspiracy to commit robbery. Appellant claims the evidence was insufficient to support his convictions, argues that the trial court abused its discretion in various evidentiary rulings, and contends that the trial court abused its discretion in imposing his sentence. We affirm.

The trial court summarized the factual background of this case as follows:

> The trial testimony revealed that [] Dailyl Jones [("the victim")], left his home on Green Street in Harrisburg after receiving a

_____

* Former Justice specially assigned to the Superior Court.

phone call on the evening of December 12, 2013. [] Tasha Evans, his live-in girlfriend, [] knew that [the victim] had been selling "dippers" – a marijuana cigarette dipped in PCP. Ms. Evans assumed that the telephone call on the evening of [the victim's] death had something to do with a drug sale. Ms. Evans received a call from her cousin at 1:37 a.m. [indicating] that something had happened to [the victim], and Ms. Evans went to the crime scene.

Officer Robert Yost responded to [a report of a male who had been shot sitting in a car] on the evening of December 12th just before 11:00 p.m. When Officer Yost arrived at the scene, he observed a black male lying in the driver's seat with a good amount of blood coming out of the vehicle. The male had a prosthetic leg that was lying near his person, and he had a very light pulse. Officer Yost immediately requested emergency services. Officer Yost observed a gold bullet casing in the empty front passenger seat. Next to the bullet casing was a clear sandwich bag with a white chunky substance in it, which he identified as crack cocaine. While Officer Yost was tending to the victim, he smelled a very "caustic odor," which he identified as PCP. In the rear of the floorboard, he found a PCP cigarette, or "dipper." Officer Yost also observed the prosthetic leg of the victim, which was lying on the floor of the car, which looked as though it had been removed from him, along with a white iPhone in the center console. After the ambulance came and left the scene with the victim, Officer Yost ran the license plate on the vehicle … which revealed that it belonged to [the victim]. It was ultimately determined that [the victim's] cause of death [was] a gunshot wound to the back.

[At trial,] Danzelle Chase was called as a witness. Mr. Chase testified that he knew [Appellant] through his little brother Randy. He also testified that he knew a man named George Brown through his brother … He knew [the victim] by his street name, which was "Half Nick." He also knew [the victim] sold drugs. Mr. Chase testified that he was around on the night that [the victim] was killed at the corner of Fourth and Woodbine Streets. Specifically, he said that he witnessed two men "tussling" with [the victim], and that someone had been screaming, "Shoot him, shoot him!" [The victim] was shot, and Mr. Chase ran away. Before he ran, Mr. Chase observed [the victim's] prosthetic leg come off during the tussle, and saw something spill out of it. When asked if George Brown was one

of the people tussling with Half Nick, Mr. Chase replied yes, and that it was Mr. Brown who was yelling "shoot him." Mr. Chase then testified that the person who fired the shot at [the victim] was *not* [Appellant].

At this point in the proceedings, Mr. Chase was asked whether he testified under oath at the August 28th preliminary hearing. Mr. Chase responded that he did. Mr. Chase's preliminary hearing testimony included the following: "[F]rom across the street, it was these two gentlemen over here trying to rob Half Nick, and Half Nick started beating George Brown up, and then kept screaming … for Zha-Zha to shoot him, and then he shot him." When asked at the preliminary hearing if "Zha-Zha" was referring to [Appellant]. Mr. Chase answered, "Yes." At that point [at trial], Senior Deputy District Attorney John Baer [asked], "[is that] … obviously different than the testimony you provided here today?" Mr. Chase answered in the affirmative.

Mr. Chase was then questioned about two different statements he made to police at the Harrisburg City Police Department. The first statement was taken on May 8th of 2014 by Detective Iachini. At that time, Mr. Chase was in state prison for something completely unrelated to the case at hand. Mr. Chase testified that he had a counselor in prison by the name of Miss Paul. Mr. Chase told Miss Paul that he needed to get something off his chest, which led to him giving a statement to Detective Iachini about "Half Nick's" murder. Mr. Chase said in his statement that he saw George Brown in a tussle trying to rob Half Nick, and that the other person with them was a guy from Philly that had the first name "Z." However, Mr. Chase did not name him.

A second statement was taken from Mr. Chase by Detective Iachini on June 20th, 2014, also at the Harrisburg Police Department. When asked at trial if the June 20th statement was voluntary, Mr. Chase said it was involuntary, [claiming] that he was threatened and forced to give it. Attorney Baer reminded Mr. Chase that at the conclusion of such statement, Detective Iachini asked Mr. Chase: "Did we do anything that forced you to come in here today and say, you know, to change your story and tell us what we want to hear? Mr. Chase [stated] "No." Detective Iachini [continued,] "[a]nd … what you are telling us then because that's the truth and how it actually happened?" Mr. Chase [responded,] "Yes." At trial, the Commonwealth

- 3 -

reminded Mr. Chase that … [in his June 20th statement, he identified Appellant as the shooter]. In recapping Mr. Chase's testimony, the following exchange took place between Attorney Baer and Mr. Chase:

> Q: You, then in this June statement, Danzelle, you tell them you were trying to protect [Appellant] initially [in the May statement], and then you came clean and you named him in the second statement, right?
>
> A: Right.
>
> Q: That's what you told Iachini?
>
> A: Right.
>
> Q: And then you went on to the preliminary hearing where you testified under oath to the exactly the same thing?
>
> A: Right.

[N.T., 1/13/16, at 60-61.]

***

Detective Iachini … testified about that phones that were found in [the victim's] vehicle. One was a T-Mobile Sidekick, and the other phone was a white iPhone. After speaking with [the victim's] girlfriend, Detective Iachini determined that the T-Mobile Sidekick was the one used by [the victim]. It was suspected by Detective Iachini that the iPhone belonged to someone who might have been in the car with [the victim] before he died. After law enforcement left the crime scene, Detective Iachini received information that George Brown had posted a photo of a white iPhone on Facebook, along with his phone number, saying that someone had stolen his phone, or that he had lost it. Detective Iachini called the phone number from the Facebook page from his personal cell phone; his number appeared on the white iPhone as it was ringing, indicating that it was indeed George Brown's iPhone. After searching phone records, it was confirmed that the iPhone was registered to George Brown's sister, with whom he was residing at the time of the murder.

The phone records also revealed that several calls were made between George Brown's and [the victim's] cell phone numbers, the last one between the two being made at 10:36 p.m. on the evening of the homicide initiating from Mr. Brown's phone to [the victim's phone]. The call to the police reporting the shooting came at 10:45 p.m.

Trial Court Opinion, 9/14/16, at 3-8.

Appellant proceeded to a jury trial that took place on January 12-15, 2016. At the conclusion of the trial, the jury convicted Appellant of first-degree murder, robbery, and conspiracy to commit murder. On March 22, 2016, the trial court sentenced Appellant to life imprisonment without the possibility of parole. Appellant did not file a post-sentence motion, but instead filed a notice of appeal on April 20, 2016. Appellant complied with the trial court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review on appeal:

1. Whether the evidence admitted at trial was sufficient as a matter of law to sustain Appellant's convictions for first-degree homicide, robbery, and conspiracy?

2. Whether the trial court abused its discretion by permitting the jury to hear evidence that George Brown was convicted of Dailyl Jones' murder?

3. Whether the trial court abused its discretion by permitting the Commonwealth to examine Danzelle Chase as a hostile witness?

4. Whether the trial court committed reversible error by selectively publishing an impermissible portion of the court's jury instructions to the jury during deliberations?

5. Whether the trial court erred and abused its discretion by sentencing Appellant to life in prison without the possibility of

parole without properly considering the factors set forth in 18 Pa.C.S. § 1102.1?

Appellant's Brief, at 4 (renumbered for review).

Appellant first challenges the sufficiency of the evidences supporting his convictions for first-degree murder, robbery, and conspiracy to commit robbery. Our standard of review for a sufficiency challenge is as follows:

> In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Further, the trier of fact is free to believe all, part, or none of the evidence.

*Commonwealth v. Rayner*, ---A.3d---, 2016 WL 7474406 (Pa. Super. filed Dec. 29, 2016).

To sustain a conviction for first-degree murder, the Commonwealth must prove beyond a reasonable doubt that the defendant committed "an intentional killing." 18 Pa.C.S. § 2502(a). An intentional killing is defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d).

To sustain a conviction for robbery under Section 3701(a)(1)(i), the Commonwealth must prove beyond a reasonable doubt that the defendant "in the course of committing a theft, … inflicts serious bodily injury upon another." 18 Pa.C.S. § 3701.

To sustain a conviction for criminal conspiracy, the Commonwealth must prove beyond a reasonable doubt that "the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Knox*, 50 A.3d 732, 740 (Pa.Super. 2012) (citations omitted); 18 Pa.C.S. § 903(a)(1)–(2). Further, this Court has provided that:

> The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation.

*Id*. We emphasize that "[w]here the existence of a conspiracy is established, the law imposes upon a conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators if such acts are done in pursuance of the common design or purpose of the conspiracy." *Commonwealth v. Fisher*, 622 Pa. 366, 377, 80 A.3d 1186, 1192 (2013).

Appellant does not challenge any particular element of the aforementioned crimes, but claims his conviction cannot stand on the inconsistent statements of Danzelle Chase, who recanted his identification of

Appellant as the shooter at trial. Appellant characterizes Mr. Chase as an inmate who lied in order to get out of jail and suggests that his testimony is so unreliable that it is insufficient as a matter of law. We emphasize that

> questions regarding the reliability of the evidence received at trial [are] within the province of the finder-of-fact to resolve, and … [our courts] will not, on sufficiency review, disturb the finder-of-fact's resolution except in those exceptional instances … where the evidence is so patently unreliable that the jury was forced to engage in surmise and conjecture in arriving at a verdict based upon that evidence.

*Commonwealth v. Brown*, 617 Pa. 107, 150, 52 A.3d 1139, 1165 (2012) (citing *Commonwealth v. Karkaria*, 533 Pa. 412, 419, 625 A.2d 1167, 1170 (Pa. 1993)). Moreover, a conviction may rest entirely on prior inconsistent statements of witnesses who testify at trial, and such statements "which meet the requirements for admissibility under Pennsylvania law, must ... be considered by a reviewing court in the same manner as any other type of validly admitted evidence when determining if sufficient evidence exists to sustain a criminal conviction." *Brown*, 52 A.3d at 1171.

Viewing the record in the light most favorable to the Commonwealth, we reject Appellant's assertion that this evidence is so patently unreliable that the jury was forced to engage in surmise and conjecture in arriving at a guilty verdict. The prosecution presented a cohesive theory supported by evidence suggesting that Appellant and Brown arranged a fake drug deal to meet the victim and rob him. The Commonwealth presented phone records

showing that Brown called the victim's cell phone several times just minutes before the murder. As the victim was a drug dealer, his girlfriend inferred that the individuals calling the victim wanted to engage in a drug transaction. The victim then met with Brown and Appellant, presumably to sell them drugs. Mr. Chase, an eyewitness to this meeting, testified that he observed Brown and Appellant, "tussling" with the victim, heard Brown yell for Appellant to shoot the victim, and saw Appellant shoot the victim. Police discovered drugs and Brown's cell phone in the victim's vehicle. Accordingly, we find there was sufficient evidence to enable the jury to conclude beyond a reasonable doubt that Appellant was guilty of first-degree murder, robbery, and conspiracy to commit robbery.

Second, Appellant claims the trial court abused its discretion in allowing the jury to hear evidence that Brown was convicted of the victim's murder. Our standard of review for evidentiary matters is well-established:

> The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. In determining whether evidence should be admitted, the trial court must weigh the relevant and probative value of the evidence against the prejudicial impact of the evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact.

*Commonwealth v. Antidormi*, 84 A.3d 736, 749 (Pa.Super. 2014) (citation omitted).

While Appellant blames the trial court for allowing the jury to hear that Brown was convicted of the victim's murder, he fails to recognize that defense counsel was the first to repeatedly refer to and elicit testimony about this inadmissible evidence. In fact, on one occasion, defense counsel actually asked Detective Iachini directly if Brown had been found responsible for the victim's death:

[Defense counsel]: You initially charged two individuals[?]

[Detective Iachini]: That's correct.

[Defense counsel]: You charged [Appellant] and George Brown?

[Detective Iachini]: That's correct.

[Defense counsel]: George Brown was subsequently convicted for the homicide of [the victim], correct?

[Prosecutor]: Judge, I object to that. I am not sure that's relevant.

[Trial court]: Are you going to go much farther with that?

[Defense counsel]: That was all, sir.

[Trial court]: Move on with your cross.

[Defense counsel]: Can he answer, Your Honor?

[Trial court]: Yes, you can answer.

[Detective Iachini]: That's correct.

N.T. Trial, 1/14/16, at 78-79. Although the prosecutor tried to object to prevent Detective Iachini from referring to Brown's conviction, defense counsel insisted being allowed to elicit this testimony. We fail to see how

Appellant can claim the trial court committed reversible error when defense counsel was responsible for the admission of the inadmissible evidence to the jury. As a result, we find this claim to be meritless.

In his third and fourth claims, Appellant argues that the trial court "abused its discretion by permitting the Commonwealth to examine Danzelle Chase as a hostile witness" and "committed reversible error by selectively publishing an impermissible portion of the court's jury instructions to the jury during deliberations." Appellant's Brief at 4. However, Appellant concedes that he did not raise these claims before the trial court by making a timely objection. Our rules of appellate procedure provide that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). This Court has further provided:

> Issue preservation is foundational to proper appellate review....By requiring that an issue be considered waived if raised for the first time on appeal, our courts ensure that the trial court that initially hears a dispute has had an opportunity to consider the issue. This jurisprudential mandate is also grounded upon the principle that a trial court ... must be given the opportunity to correct its errors as early as possible. Related thereto, we have explained in detail the importance of this preservation requirement as it advances the orderly and efficient use of our judicial resources. Finally, concepts of fairness and expense to the parties are implicated as well.

*Commonwealth v. Miller*, 80 A.3d 806, 811 (Pa.Super. 2013) (quoting *In re F.C. III*, 607 Pa. 45, 2 A.3d 1201, 1212 (2010) (citations omitted)). As Appellant failed to raise these issues before the trial court, they are waived.

Lastly, Appellant claims the trial court abused its discretion by sentencing Appellant to life in prison without parole without properly considering the factors set forth in 18 Pa.C.S. § 1102.1, which instructs the court to consider mitigating circumstances, including age-related factors, in determining whether to impose a sentence of life imprisonment without parole on a juvenile. Our legislature enacted Section 1102.1 in response to the United States Supreme Court's decision in **Miller v. Alabama**, \_\_\_U.S.\_\_\_, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), which invalidated mandatory life sentences for juvenile offenders.

Our court has viewed a challenge to the trial court's weighing of sentencing factors, including mitigating factors listed in **Miller**, as a challenge to the discretionary aspects of sentence. **Commonwealth v. Seagraves**, 103 A.3d 839, 841 (Pa.Super. 2014). However, "issues challenging the discretionary aspects of a sentence must be raised in a post-sentence motion or by presenting the claim to the trial court during the sentencing proceedings. Absent such efforts, an objection to a discretionary aspect of a sentence is waived." **Commonwealth v. Cartrette**, 83 A.3d 1030, 1042 (Pa.Super. 2013). As Appellant did not raise this issue at sentencing and did not file a post-sentence motion, this claim is also waived.

For the foregoing reasons, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/14/2017