J. S55001/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                  :           PENNSYLVANIA
            v.                 :
                                    :
AKEEM PAGE-JONES,             :          No. 1581 WDA 2013
                                    :
           Appellant      :

Appeal from the Judgment of Sentence, August 26, 2013,
in the Court of Common Pleas of Allegheny County
Criminal Division at No. CP-02-CR-0004298-2011

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., AND STRASSBURGER,* J.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:     **FILED NOVEMBER 16, 2015**

Following a jury trial, Akeem Page-Jones was convicted of first degree murder, two counts of arson, one count of possession of a firearm by a minor, one count of theft by unlawful taking and six counts of recklessly endangering another person.  On August 26, 2013, the Honorable Jill E. Rangos sentenced appellant to an aggregate term of 60 years to life in prison.  We affirm.

The facts as summarized by the trial court are as follows:

> Theresa Williams Dawson, mother of the victim Teesa Williams, testified that on March 22, 2011, Dawson left her home at 6:15 a.m. to go to work. Dawson's seventeen year old mentally retarded daughter, Teesa, remained at home to await the school bus, per their normal routine.  At 6:25 a.m., Teesa called Dawson to say she was on the bus.  Dawson did not believe her because she could not hear in the background any other children's voices.

---

\* Retired Senior Judge assigned to the Superior Court.

Later that morning she received a call from Teesa's school indicating that a neighbor had reported the Dawson's house was on fire. Although one of the police officers on scene originally told Dawson that Teesa was fine, Teesa did not survive the fire.

Dawson further testified that her living room television had [a] cable box, a DVD player, and a month old PlayStation 3 video game system. Dawson was shown pictures of her home after the fire and she testified that the television was moved away from the wall and some dried flowers and twigs were missing from a vase near the front door. Dawson was later shown a picture of a purse and identified it as belonging to her and located in her home prior to the fire.

Penn Hill[s] Police Officer Andrew Kolek testified that he was dispatched to 11276 Azalea Street at 9:47 a.m. for a report of heavy smoke coming out of a house. Officer Kolek was the first to arrive at the scene and he attempted to determine if anyone was inside. Although the front door was locked, the officer gained entry via a side door that was left a few inches ajar. Officer Kolek entered the kitchen, yelled 3-4 times to determine if anyone was further inside, but was quickly forced to retreat due to the intense heat of the fire and his lack of protective equipment.

Greg Renko, a volunteer firefighter for fifteen years, most recently with the Penn Hills Fire Department, testified that he was dispatched at 9:48 a.m. to Azalea Drive and he arrived at the scene seven minutes later, at 9:55. While searching the home for individuals who may have been trapped inside, he found the victim, Teesa Williams, face down on the floor of the last bedroom on the first floor. He testified to observing an increased heat intensity and very dark, thick smoke emanating from that room. Teesa had visible burn marks on her back and shoulder blade and her underwear had been pulled down to her thighs. Renko carried her out of the building, and once safely outside, laid her

down on her back. He then observed trauma to Teesa's face. Teesa appeared to be unconscious and not breathing when Renko got her outside and turned her over to medics for treatment.

Renko returned to the bedroom and observed a bloody pillow on [the] floor where Teesa had been and a bloody handprint on a dresser nearby. Renko observed charring on a rug on the floor, and embers smoldering on the floor to the right hand side of the bed closest to the closet door. As he extinguished the smoldering item, he observed it to be a roll of paper towels. Shortly thereafter, Renko secured the room with yellow "Caution" tape.

Sean Gongaware, a volunteer firefighter with the North Bessemer Community Volunteer Fire Department, testified that he also went inside the Azalea Street residence and entered the bedroom at the end of the hall. As part of his secondary search, he found a pile of debris in the bedroom. While he was moving around the pile, which appeared to be clothing and blankets, a roll of paper towels spontaneously reignited.

Deputy Fire Marshall Michael Liko of the Allegheny County Fire Marshall's Office testified as an expert witness in the field of fire origination and fire investigation. He determined that the fire originated in the kitchen on the right hand side of the natural gas stove, specifically on the countertop towards the back part of the backsplash wall. He further determined that the cause of the fire was incendiary, meaning that it was intentionally set. In his expert opinion, the fire was set with some sort of combustible material on the countertop, such as paper towels, napkins or a dishtowel.

Chief Deputy Fire Marshall Donald Brucker testified that he was in charge of overseeing the processing of the back bedroom. Looking into the bedroom, he observed remnants of burned paper towels and twig material. He described the twigs as consistent with stems of flowers or some similar type

of decoration. A burned afghan blanket and a bloodstained pillow were also on the floor. He determined that the origin of the fire in the bedroom was the floor, and the cause was incendiary. Chief Brucker's expert opinion was that the dried flower arrangement Dawson noted was missing from the vase by the front door[,] *i.e.* the twig material, was used to facilitate movement of fire. He further determined that the kitchen and bedroom fires were remote and unconnected to each other. He testified that the fire damage to the bedroom was a result of an open flame being applied to material which was subsequently applied to the victim.

Detective Timothy Langan testified that he was called to the scene after the victim was found in the home. While processing the scene, Detective Langan observed a spent .22 caliber casing on a crumpled pair of women's jeans on the bedroom floor next to the victim's bed. He also found a small bullet hole in the lower portion of the closet door. A projectile was located in a shoe box inside a bag in the closet. In addition, Detective Langan recovered a cell phone from on top of the bed.

Linda Beaudry, a neighbor of the victim, testified that on the day of the fire, she saw a boy walking down an adjacent driveway carrying a purse that had a video game system sticking out the top. She identified Commonwealth Exhibit #7 as the same or very similar to the purse she saw that day. She described the boy as clean cut, somewhat large build and approximately in his late teens. She further testified that she saw no one with him.

Detective Anthony Perry with the Allegheny County Police Department, homicide section, testified that, with the consent of Carolyn Page-Jones (Appellant's adoptive mother, biological maternal grandmother and the owner of the house, hereafter referred to as Grandmother) he and other officers searched Appellant's residence. Specifically, Detective Perry searched the finished basement area and found a four drawer metal file cabinet Detective

Perry found a tan Dolce and Gabanna purse inside the file cabinet and stated that Commonwealth Exhibit #7 was the bag retrieved from inside the file cabinet. Both Appellant and his Grandmother denied knowledge or ownership of the purse.

Nathan Hoye testified that he had been involved in an online relationship with Teesa for a few weeks and had met her in person just a couple of days prior to her death. When they met in person, another individual was present, a light skinned, heavy set male with a cast on his arm. The day Teesa died, Hoye tried to text and call her between 9:00 a.m. and 12:00 p.m. but Teesa did not answer.

Joseph King testified that in 2011 he owned a .22 caliber pistol which he had purchased off the streets. He and Appellant were friends, and took pictures of themselves with the gun. The day before Teesa died, King and Appellant were trying to repair the gun. Appellant volunteered to test fire the gun in the woods. After Appellant left King's house with the gun, Appellant called King and told him that Appellant had fired two shots and then the gun jammed. Instead of returning the gun to King, Appellant told King via cell phone that someone had seen him shoot the gun so he would return it in the morning.

The following day, King first found out about the fire and Teesa's death at approximately 2:00 p.m. when a friend called him. King called Appellant to tell him about Teesa because Appellant had told King the day before that he was having a sexual relationship with Teesa. Appellant responded, "that's crazy." An hour or two later, Appellant went to King's home and sold him a PlayStation 3 video game system for $100.00. From there, King's uncle took the PlayStation to his girlfriend's house, where the police eventually recovered it.[Footnote 3] When he brought over the PlayStation, Appellant also returned the gun and told King that one of the bullets was missing. Later that same day, King sold

the gun to Maclain Cupid. Cupid confirmed in his testimony that he purchased a gun and ammunition from King that day. Cupid gave the gun to one of the homicide detectives after the detective informed him that the gun had been used to kill Teesa.

> [Footnote 3] Detective Miller subsequently testified that he recovered the PlayStation from King's uncle's house after King told him that Appellant sold King the PlayStation between 12:30 and 2:30 p.m. on the day Teesa died.

At approximately 9:00 p.m. on the night of the fire and Teesa's death, Detective Gregory Matthews conducted an interview with Appellant who was accompanied by his grandparents. Appellant initially stated that he became aware of the fire and Teesa's death at around 2:00 p.m., when he was calling people to try to get a ride. After Appellant's arrest two days later, Detective Matthews conducted a second interview of Appellant. This time Appellant['-]s grandparents and his biological mother were present. At this interview, Appellant admitted that he had bragged to King about having a sexual relationship with Teesa. He further admitted to having King's gun and firing it twice the night before Teesa's death.

During Detective Matthews' interview, Appellant agreed to let the detective download the contents of his phone. One of the pictures on Appellant's cell phone showed him holding a .22 caliber gun. In the same photo, which Appellant testified was him, Appellant has a cast or bandage[Footnote 4] on his hand. Detective Matthews stated that Appellant adamantly denied any phone calls or text messages between himself and Teesa. Appellant later testified at trial that he had called and/or texted Teesa both the day before and the day of Teesa's death. Appellant also admitted at trial that he deleted everything on his phone relative to Teesa.

[Footnote 4] Nathan Hoye, whom Teesa had introduced as her new boyfriend the day before her death, testified that when he saw Teesa the day before she died, she was talking with a light-skinned heavy-set male with a cast or something on his arm.

Detective Matthews testified that Appellant told him during this interview that on the morning of Teesa's death, shortly before 7:00 a.m., Appellant knocked on King's door with the intent to return the gun. When King did not answer, Appellant went to Teesa's home. Appellant said that Teesa let him in, and a black male in his 20's who Appellant did not know was already in Teesa's living room. Appellant claimed this unknown individual somehow obtained the gun, shot Teesa in the hallway outside of Appellant's line of sight, dropped the gun and ran out of the house. Appellant said he then pick[ed] up the gun, placed it in a purse and left the residence as well.

When Detective Matthews informed Appellant that the evidence did not correspond to Appellant's explanation, Appellant offered another version of events. Appellant said that when he arrived at Teesa's house, an unknown male was already in the home. Appellant took off his coat, sat down in the living room and started watching TV. Next, the unknown male followed Teesa down the hallway, and Appellant followed the unknown male. Appellant said that the unknown male shot and killed Teesa in the hallway outside the bedroom door.

Detective Matthews then told Appellant that the ballistic evidence did not support the location of the shooting as described by Appellant. Appellant, in his third explanation to police, indicated he had acted alone and no unknown black male had been in the residence. Appellant told the detective that Teesa was obsessed with wanting to hold the gun, that a struggle ensued, and the gun went off one time. Appellant decided to set her on fire, so he

took an afghan and laid it across the right side of her body. He said that he took some dried weeds or flowers and used the stove in the kitchen to ignite them. He specifically indicated that he used the back right burner to ignite the dried flowers and also piled some flammable items on the stove to try to burn the house down. He said that it took several attempts to light the afghan on fire, and that he observed Teesa flinch as she felt the pain of the flames from the torch-like dried flowers against her skin. He said that he found a purse in the mother's bedroom and used it to carry the PlayStation and a few video games out of the residence when he left.

Homicide Detective Patrick Miller obtained the subscriber information and call detail logs from Teesa's phone, which had been recovered from her bed. According to those records, on the night before her death, several calls or texts were sent from Appellant's cell phone to Teesa's cell phone. The cell phone exchanges continued the next morning. The last contact from Appellant to Teesa was a call at 6:30 a.m. on the morning of her death. Detective Miller testified that the records indicate that at 9:30 a.m., Hoye also texted Teesa.

Pamela Woods, an employee of the Allegheny County Medical Examiner's Office, and an expert in forensic science with regard to trace evidence, testified that fibers taken from Teesa's esophagus and stomach were consistent with the burnt flowers recovered from the scene. Daniel Wolfe, from the same department, testified as an expert in forensic science, specifically gunshot residue, that based on his analysis of the gunshot residue kit, no particles associated with gunshot residue were detected on Teesa's hands. Wolfe testified that the results were inconclusive, meaning that because residue was not found on Teesa's hands, he could not conclude that her hands were in close proximity to the firearm when it went off thus refuting Appellant's story about a struggle over the gun.

Dr. Karl Williams, Chief Medical Examiner of Allegheny County, testified that he performed an autopsy of Teesa. He stated that Teesa had a gunshot wound going from under her chin upward, fracturing the mandible before exiting the head lateral to the right eye. After examining skin tissue around the entry wound under a microscope, he determined from the presence of gunshot residue that the barrel of the gun when it was discharged was against the skin surface. Additionally, micro tears surrounding the entrance wound support the conclusion that Teesa was shot at close range. He also opined that the gunshot wound alone would not have been fatal, as the bullet never entered Teesa's brain. Dr. Williams testified that Teesa was alive when the fire started, because he found soot lining her upper airways, trachea and the upper parts of her lungs. Teesa's carbon monoxide saturation level was recorded at 40 percent, which was high enough to indicate both that she was alive when she was exposed to a flaming object, and that the fire and resulting smoke were significant contributory causes to her death, along with blood loss and the resulting filling of her lungs with blood.

Raymond Everett, from the Allegheny County Office of the Medical Examiner testified as an expert in firearms and tool marks, specifically bullet trajectories. He testified that, based on the trajectory the bullet must have travelled, it was not plausible in this case for two people to have struggled over a gun and the gun to have discharged accidentally. Conversely, a plausible explanation would be that the shooter was standing behind the victim with the victim bent over. He was also able to determine that the .22 caliber pistol recovered and examined was operable but in poor condition. He determined the cause of death to be a combination of the gunshot wound causing blood loss and the pooling of blood in Teesa's lungs along with smoke inhalation. The manner of death was homicide.

Appellant testified in his own defense. He admitted that he lied to police and gave them

numerous accounts of the events which transpired. He stated that he did so because he was afraid of King, whom Appellant said was the real assailant. Appellant said he was present during the shooting and that King had threatened to kill Appellant and his family if he didn't cooperate by giving King a burning afghan to throw on Teesa and by taking the PlayStation afterwards. He admitted that he called King ten times after Teesa's death, and later that afternoon went to King's house, despite Appellant's assertion that King had threatened to kill him.

Trial court opinion, 12/19/14 at 3-12 (citations to record omitted).

The jury convicted appellant of all counts. Appellant was sentenced on the first-degree murder count to 55 years to life imprisonment with a consecutive period of 5 to 10 years on the arson counts, concurrent to each other. He received no further penalty at the remaining counts.

Appellant raises the following issues for our review:

> I.   DID THE LOWER COURT ABUSE ITS DISCRETION WHEN IT ADMITTED INFLAMMATORY PHOTOGRAPHS OF THE VICTIM'S AUTOPSY, CAUSING UNFAIR PREJUDICE AGAINST MR. PAGE-JONES?
>
> II.  IS MR. PAGE-JONES' SENTENCE UNCONSTITUTIONALLY CRUEL AND UNUSUAL PUNISHMENT, AS JUVENILE DEFENDANTS MUST HAVE SOME REASONABLE ABIILITY [SIC] TO GAIN PAROLE?
>
> III. DID THE COMMONWEALTH PRESENT INSUFFICIENT EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT THAT MR. PAGE-JONES CAUSED THE DEATH OF MS. WILLIAMS AND DID NOT ACT UNDER DURESS?

Appellant's brief at 6.

First, appellant contends that the trial court abused its discretion when it allowed, during the testimony of Chief Medical Examiner Dr. Karl Williams, the admission of "gruesome," color, explicit and highly prejudicial photographs taken of the victim's body during her autopsy. (Appellant's brief at 21.) He argues that the photographs did not make a fact of consequence more or less probable than without submission of the photographs. Appellant contends that Dr. Williams described the victim's injuries in detail and the photographs held little or no evidentiary value. He contends the probative value of the photographs was far outweighed by the unfair prejudice he incurred.

The admissibility of photographs of a murder victim falls within the discretion of the trial court, and only an abuse of that discretion will constitute reversible error. **Commonwealth v. Tharp**, 830 A.2d 519, 531 (Pa. 2003). An abuse of discretion occurs when a trial court, in reaching its conclusions, overrides or misapplies the law or exercises judgment which is manifestly unreasonable or the result of partiality, prejudice, bias, or ill-will. **Commonwealth v. Brown**, 839 A.2d 433, 435 (Pa.Super. 2013). The test for determining the admissibility of post-mortem photographs involves a two-step analysis. First, the court must decide whether a photograph is inflammatory by its very nature. If the photograph is deemed inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly

influence the minds and passions of the jury. **Commonwealth v. Pruitt**, 951 A.2d 307, 319 (Pa. 2008). The mere fact that the medical examiner testifies to the nature of the victim's injuries and the cause of death does not render photographs of the victim duplicative. **Id.**; **Commonwealth v. Rush**, 646 A.2d 557, 560 (Pa. 1994) ("[T]he condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs."). While recognizing that photographs of a homicide victim can be unpleasant, disturbing, and brutal, our courts have held that "[t]here is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt." **Tharp**, 830 A.2d at 531, quoting **Commonwealth v. McCutchen**, 454 A.2d 547 (Pa. 1982).

In this case, the three color photographs in question were of the victim lying on a steel table in the medical examiner's office (Exhibit 85), the victim's legs[1] (Exhibit 86), and a close-up of the victim's face (Exhibit 88).

---

[1] Exhibit 86, the photo of the victim's legs, is not inflammatory. The photograph, which shows only the legs of the victim, reveals some fairly small areas of burns and what appears to be black soot. The photo illustrates the distribution of relatively small wounds in conjunction with Dr. Williams' testimony describing the configuration of burns and other injuries to the victim's body; specifically, that "the rest of the body was relatively spared other than a few areas on the legs." (Trial testimony, 5/28/13 at 367.) **See Commonwealth v. Wright**, 961 A.2d 119, 139 (Pa.

Although the photos did not depict, as appellant avers, the victim in "mid-autopsy" (appellant's brief at 21), they are, nevertheless, disturbing images which depict the victim's burned, bloody face and body. So, as a preliminary matter we agree that the photos, with the exception of Exhibit 86, while not unduly graphic, are of an inflammatory nature.

We must next determine whether the essential evidentiary value of the photos outweighed the likelihood that the photos would improperly influence the minds and passions of the jury. The photos were admitted in conjunction with Dr. Williams' testimony regarding the nature of the victim's wounds. From the time he was initially questioned by detectives up to and including trial, appellant gave numerous different versions of events. In one of those versions (*i.e.*, the version given on March 24, 2011, while appellant was in custody), appellant stated to Detective Matthews that he shot the victim in the chin or neck and then after noticing that she was still breathing, decided to set the victim on fire. (Trial testimony, 5/24/13 at 267.) Appellant described how he laid an afghan across her right side and tried a few times to set the afghan on fire by using a dried flower

_____

2008) ("photos neither gruesome nor necessarily explicit in their portrayal of the body" are admissible).

arrangement he ignited on the stove. (***Id.*** at 310.)[2] The Commonwealth's position at trial was that appellant's version about how the victim sustained the fire damage was the truth. Given appellant's various versions of events, the jury was asked to decide whether this was, in fact, what happened. Using the full-body photo (Exhibit 85), Dr. Williams described the burn patterns, and pointed to a line of generalized redness along the right side of the trunk onto the front of the trunk, lower chest, and upper abdomen. (Trial transcript, 5/28/13 at 372.)[3] As described by Dr. Williams, the photo shows a "distinctive band of thermal injuries around the right side of the trunk going on to the abdomen" which was consistent with appellant's statement to the detectives. We find that the full-body photo which depicted the burn pattern was probative in helping the jury to decide which of appellant's versions to believe.

One of appellant's defenses was that the shooting was accidental and that the gun went off when appellant and the victim were standing face-to-face struggling for the gun. Using Exhibit 88, the close-up of the victim's face, Dr. Williams identified a lateral crescent-shaped tear on the outer side of the victim's right eye as the exit wound. Dr. Williams pointed

---

[2] Detective Matthews testified that appellant "attempted to set [the victim] on fire in her own bedroom, and he wasn't having very much luck. The fire wasn't really catching. It was smoldering, but it wasn't flaming." (Trial transcript, 5/24/13 at 269.)

[3] According to the Commonwealth's attorney, the "the burns did not appear as visible" on the black-and-white photos. (***Id.*** at 369.)

out small "areas of black" coloration on either side of the entry wound below the right side of the victim's chin which he identified as a "contact wound" and explained how these "powder burns" may be an indication that the gun was very close to and/or in contact with the skin when it fired.[4] (*Id.* at 379.) Using the entrance and exit wounds, Dr. Williams described for the jury, with the use of a trajectory rod, the path of the bullet in the victim's body. We find that the close-up photo of the victim's face which showed the entrance and exit wounds was probative in discounting appellant's explanations that he and the victim were standing face-to-face and struggling for the gun when it accidentally went off. We also find the photo was probative in helping the jury to understand the proximity of the gun to the victim and the position of the victim when she was shot.[5]

Accordingly, while appellant claims that the photos did not assist the jury in any factual determination, we cannot agree. Rather, the photos were to help establish that appellant's confession (the version in which he stated he acted alone and attempted to set the victim on fire) was consistent with

---

[4] Dr. Williams confirmed with formaldehyde testing that the black material depicted on this photo was gunshot residue and that the entry wound was a contact wound, meaning the barrel of the gun was against or very close to the skin when it discharged. (*Id.* at 381.)

[5] The Commonwealth sought to prove, through Dr. Williams' opinion as to the trajectory of the bullet through the victim's body, together with the testimony of forensic examiner, Raymond Everett, regarding the trajectory of the bullet through the bedroom closet door, that the shooter was not facing the victim, but was standing behind the victim with her bent over forward, facing the ground. (Trial transcript, 5/28/13 at 412.)

the physical evidence and to disprove his defense that the shooting occurred during a struggle for the gun.

Furthermore, we note that the trial court emphasized to the jury that its decision should not be influenced by emotion. Prior to the testimony of Dr. Williams regarding the exhibits, the trial court issued the following cautionary instruction:

> I do need to caution you, however, you may find these pictures to be disturbing and unpleasant to view, but you must not let them stir your emotions to the prejudice of the Defendant. Your verdict must be based on a rational and fair consideration of all the evidence and not on passion or prejudice against the Defendant. As judges of the facts, you must view the evidence relevant to the case impassionately and impersonally. The evidence is relative to the case and to meeting the Commonwealth's burden of proof.
>
> However, this evidence is only one piece of the Commonwealth's case. It is not, by itself, conclusive. You must find each of the other elements, which I will give to you, in order to find the Defendant guilty of any or all of the crimes charged.
>
> So once again, do not allow the crime scene, the autopsy photos here to prejudice you in any way or to interfere with your ability to fairly consider all of the evidence and reach a verdict, an impartial verdict in this case.

*Id.* at 370-371.

It is well-settled that "the jury is presumed to have followed the court's instructions." *Commonwealth v. Flor*, 998 A.2d 606, 632 (Pa. 2010). For the forgoing reasons, no relief is due on this claim.

Next, appellant argues that his sentence of 60 years to life is unconstitutionally cruel and unusual punishment because: (1) his sentence is the "functional equivalent" of life without parole ("LWOP") as he will not be eligible for parole until after the expiration of his life expectancy;[6] and (2) *Miller v. Alabama*, ___ U.S. ___, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), and *Graham v. Florida*, 560 U.S. 48 (2010), require sentencing courts to "provide [juveniles] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Miller*, 132 S.Ct. at 2469, quoting *Graham*, 560 U.S. at 73. Appellant asks this court to invalidate his *de facto* LWOP sentence and remand for a new sentence which affords him a "reasonable expectation" of parole.

As an initial matter, we will address the Commonwealth's argument that appellant waived this issue for failure to include a Pa.R.A.P. 2119(f) statement in his brief.

Pa.R.A.P. 2119(f) provides:

> **(f)** **Discretionary aspects of sentence.** An appellant who challenges the discretionary aspects of a sentence in a criminal matter shall set forth in a separate section of the brief a concise statement of the reasons relied upon

---

[6] Appellant will be 78 years old at his first opportunity for parole. Citing "Michigan Life Expectancy Data for Youth Serving Natural Life Sentences," *The Campaign for the Fair Sentencing of Youth*, Michigan ACLU, http://fairsentencingofyouth.org/wp-content/uploads/2010/02/Michigan-Life-Expectancy-Data-Youth-Serving-Life.pdf, (April 2013), appellant, noting the similarities between Pennsylvania and Michigan's demographics, asserts that the average life expectancy of an African-American youth given a life sentence is 50.6 years.

> for allowance of appeal with respect to the discretionary aspects of a sentence. The statement shall immediately precede the argument on the merits with respect to the discretionary aspects of the sentence.

We do not agree with the Commonwealth that Pa.R.A.P. 2119(f) applies, as appellant did not challenge a discretionary aspect of his sentence. It would appear from caselaw that a claim that a sentence violates an individual's right to be free from cruel and unusual punishment is a nonwaivable challenge to the legality of the sentence. ***Commonwealth v. Seskey***, 86 A.3d 237 (Pa.Super. 2014), ***appeal denied***, 101 A.3d 103 (Pa. 2014); ***Commonwealth v. Brown***, 71 A.3d 1009 (Pa.Super. 2013) (a challenge to the constitutionality of a mandatory sentence of life in prison without the possibility of parole for a juvenile challenges the legality of the sentence and thus cannot be waived); ***Commonwealth v. Yasipour***, 957 A.2d 734, 740 n.3 (Pa.Super. 2008), ***appeal denied***, 980 A.2d 111 (Pa. 2009). ***Cf. Commonwealth v. Seagraves***, 103 A.3d 839 (Pa.Super. 2014) (reviewing a juvenile appellant's challenge to the discretionary aspects of his LWOP sentence on the grounds that sentencing court failed to take into consideration the mitigating factors listed in ***Miller***). ***See also Commonwealth v. Knox***, 50 A.3d 732 (Pa.Super. 2012), in which this court, pursuant to ***Miller***, vacated a mandatory sentence of LWOP for second-degree murder committed when the defendant was a juvenile, and

we expressly stated that the claim before us was a challenge to the legality of the sentence. *Id.* at 741. Thus, we will review the merits of this issue.

Appellant contends that his lengthy term-of-years sentence poses the same constitutional questions for juveniles as the mandatory LWOP sentences struck down by the Supreme Court in *Miller*. He argues that a 60-year minimum sentence is unconstitutional because it is the "functional equivalent" to LWOP. We disagree. 18 Pa.C.S.A. § 1102.1(d), enacted in direct response to *Miller*, requires the trial court to consider the age-related factors espoused in *Miller*. Here, the trial court did exactly what it was required to do. It conducted an individualized sentencing hearing on August 26, 2013, during which it considered the factors set forth in *Miller* and Section 1102.1(d).

Further, *Miller* does not categorically prohibit sentences of life without parole for juvenile offenders convicted of *homicide offenses*. *Commonwealth v. Batts*, 66 A.3d 286 (Pa. 2013). By the same token, *Miller* does not categorically prohibit the "functional equivalent" of an LWOP sentence either. Rather, *Miller* held that the Eighth Amendment prohibits sentencing schemes that mandate a minimum sentence of LWOP for juvenile offenders regardless of their age and age-related characteristics and the nature of their crimes. *Miller* requires the sentencing court to consider various age-related factors before it may impose a sentence on a juvenile for

a homicide offense. This is precisely what the trial court did. Therefore, we find that this argument is without merit.

In his final issue, appellant argues that the Commonwealth did not present sufficient evidence to prove beyond a reasonable doubt that he, rather than Joseph King, caused the victim's death. He also contends that the Commonwealth failed to present sufficient evidence to rebut his testimony that he acted under duress[7] on the day in question.

The test for reviewing a sufficiency of the evidence claims is well-settled:

> [W]hether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt. . . This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt.

***Commonwealth v. Hardcastle***, 546 A.2d 1101, 1105 (Pa. 1988) (citations omitted).

---

[7] 18 Pa.C.S.A. § 309(a) provides the definition of duress:

**§ 309. Duress.**

**(a) General rule.--**It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, a threat to use, unlawful force against his person or the person of another,

- 20 -

We have carefully reviewed the entire record and find that the evidence more than supported the conclusion that appellant acted alone and that he was both the shooter and the arsonist responsible for the victim's death.

At trial, appellant testified that he invited Joseph King to accompany him to the victim's house and once there, King shot the victim and forced appellant to set the victim and her house on fire under threats to appellant and his family. However, before trial appellant gave multiple versions to detectives including that he acted alone; he shot the victim, and then ignited a dried flower arrangement on the stove, carried it to the victim's bedroom and used it to ignite the afghan which he had placed across her while she was still alive. Appellant's statement was consistent with the physical and medical evidence. Also consistent with the physical evidence was appellant's statement to the detectives that revealed his knowledge of exactly where the bullet entered the victim's body. At the same time, such knowledge was completely inconsistent with his self-serving testimony at trial that he was sitting in the living room when King shot the victim. Appellant had also told the detective that he saw the victim's body flinching each time he attempted to set her on fire. He described how he had trouble getting the afghan to actually catch on fire, so he decided to burn the entire house down and pile

which a person of reasonable firmness in his situation would have been unable to resist.

items on the stove which he knew would catch on fire. Further, the evidence revealed that appellant had an established relationship with the victim and had called and texted her several times that morning. He deleted his cell phone records before he gave his phone to the police. During one of his statements, appellant stated that he took the PlayStation and placed it in a yellow purse he found at the victim's house. A yellow purse, belonging to the victim's mother, was found in appellant's home, and a witness testified that she saw appellant carrying a yellow purse in the vicinity of the victim's home. Finally, appellant admitted that despite his supposed fear of King, he willingly contacted King after the murder and went to King's home.

We find that the evidence was more than sufficient to allow the jury to determine that appellant's trial testimony was a fabrication and that he did not act under any threat of duress or serious bodily injury and that he had every opportunity to avoid committing his criminal acts. The evidence overwhelmingly established that appellant caused the death of the victim. His convictions, including first degree murder, are affirmed.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/16/2015