J-A10039-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
SAMUEL EDWARD SMITH :
:
Appellant : No. 3599 EDA 2016

Appeal from the Judgment of Sentence October 31, 2016
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0002130-1996

BEFORE: GANTMAN, P.J., McLAUGHLIN, J., and RANSOM*, J.

MEMORANDUM BY RANSOM, J.: **FILED JUNE 27, 2018**

Appellant, Samuel E. Smith, appeals from the judgment of sentence of

life imprisonment without parole, imposed October 31, 2016, following a grant

of Appellant's Post-Conviction Relief Act (PCRA) petition for resentencing

pursuant to ***Miller v. Alabama***, 132 S. Ct. 2455 (2012), ***Montgomery v.***

***Louisiana***, 136 S. Ct. 718 (2016), and ***Commonwealth v. Batts***, 66 A.3d

286 (Pa. 2013) (***Batts I***). We affirm.

The procedural history and relevant facts are as follows:

On October 10, 1996, Appellant pleaded guilty to first-degree murder,

robbery, and conspiracy.[1] Appellant was sentenced to a mandatory term of

life imprisonment without the possibility of parole and an aggregate,

concurrent sentence of ten to twenty years of imprisonment on the remaining

_____

[1] 18 Pa. §§ 2502(a), 3701(a)(1)(i), and 903, respectively.

* Retired Senior Judge assigned to the Superior Court.

charges. Appellant was sixteen at the time he committed the murder. Appellant did not file a direct appeal.

During his incarceration, Appellant filed multiple, unsuccessful petitions for writ of *habeas corpus* and PCRA relief. However, on July 27, 2012, Appellant *pro se* filed a PCRA petition alleging that he was entitled to relief pursuant to the United States Supreme Court's decision in **Miller**, where the Court held that "mandatory life without parole for those under the age of 18 at the time of their crime violates the Eighth Amendment's prohibition on 'cruel and unusual punishment.'" **Miller**, 132 S. Ct. at 2460. Appellant's petition was stayed pending the disposition of cases pending before the Pennsylvania Supreme Court. While Appellant's case was on hold, the United States Supreme Court decided **Montgomery**, holding that **Miller** applied retroactively. **Montgomery**, 136 S. Ct. at 736; **see also Commonwealth v. Secreti**, 134 A.3d 77, 82 (Pa. Super. 2016) (recognizing "the **Miller** rule of law … to be retroactive for purposes of collateral review as of the date of the **Miller** decision on June 25, 2012."). In response to this decision, Appellant's case was scheduled for resentencing.

On July 25, 2016, Appellant requested a stay of his sentencing hearing, pending the decision in **Commonwealth v. Batts**, 163 A.3d 410 (Pa. 2017) (**Batts II**). Notes of Testimony (N.T.), 7/25/16, at 2. The sentencing court denied Appellant's motion but approved a stipulation that: (1) the Commonwealth was required to prove beyond a reasonable doubt that Appellant qualified for a sentence of life without the possibility of parole; and

(2) there is a presumption against imposing a life sentence without the possibility of parole on a juvenile offender. *Id.* at 7-8. Appellant also presented a motion to continue the sentencing hearing in order to secure expert witnesses to counter the Commonwealth's expert witnesses. *Id.* at 8-9. While the sentencing court declined to postpone the Commonwealth's presentation of evidence, it nonetheless afforded Appellant extra time to secure witnesses and prepare his case.[2] *Id.* at 29.

On July 26, 2016, the sentencing court commenced Appellant's resentencing hearing. The Commonwealth presented extensive testimony from numerous witnesses, including for example: the original police investigators, victim impact statements, as well as expert testimony. Appellant presented testimony from family and friends. For appellate purposes, we highlight the following relevant testimony:

The Commonwealth called Lieutenant Michael Torres, a Pennsylvania Department of Corrections Officer. Notes of Testimony (N.T. Excerpt), 7/26/16, at 3.[3] Lieutenant Torres was qualified as an expert in prison gangs.

---

[2] The court directed Appellant to advise it of the time he would require. N.T., 7/25/16, at 29. The following day, Appellant requested sixty days to secure his expert witnesses, and a date was set for September 7, 2016. N.T. Continuance, at 4. Following the Commonwealth's presentation, the sentencing hearing was in fact continued until October 18, 2016.

[3] The sentencing court provided this Court with three volumes of transcripts for July 26, 2016. The first volume contains the main records for the first half of Appellant's sentencing hearing and hereinafter will be labeled N.T. Sentencing. The second volume includes excerpt testimony from three

*Id.* at 3-7. He testified that Appellant was the leader of prison gang known as the State Prison Skinheads (SPS), a neo-Nazi white supremacist group. *Id.* at 20. Lieutenant Torres also related information regarding Appellant's attempted escape in 2004. According to Lieutenant Torres, Appellant planned a detailed escape utilizing former and current inmates affiliated with SPS and planned to secure a firearm. *Id.* at 15-16. A confidential informant, whom Appellant threatened to kill once he established his identity, thwarted this attempt. *Id.* at 18-19. As a result of this escape attempt, Appellant was transferred to State Correctional Institute (SCI) Greene, a maximum-security prison with a high-risk prisoner designation, where he is currently housed. *Id.* at 19. Lieutenant Torres also reported that prior to Appellant's appeal, Appellant had received nineteen prison misconducts. *Id.* at 9.

Finally, Lieutenant Torres also opined that, in his experience, Appellant was a rare and uncommon inmate. *Id.* at 34-37. He based this assessment on Appellant's files, past escape attempt, membership in a prison gang, and the number of misconducts. *Id.* According to Lieutenant Torres, Appellant's nineteen misconducts were excessive, as were his number of days in restrictive housing. *Id.* at 9, 13-14. Lieutenant Torres conceded that there was a period of time in which Appellant had received no misconducts but

---

witnesses, and hereinafter will be labeled N.T. Excerpt. The last volume is an excerpt of Appellant's request for a continuance and will be labeled N.T. Continuance.

offered two explanations for Appellant's good behavior: 1) he was eligible for resentencing; and 2) he wanted to maintain his gang leadership. *Id.* at 34-35. Lieutenant Torres testified that his office had confiscated a document from Appellant that was entitled the "Supreme Word." *Id.* at 26.[4] The document identified Appellant as the editor of the "Supreme Word" and a member of SPS. *Id.* at 27. According to Lieutenant Torres, the document contained images of skinheads, symbols, and articles espousing rhetoric against Jews, "all colored races," and the mafia, ending with a hidden salute to Hitler. *Id.* at 28-33.

Next, over Appellant's objection, the Commonwealth called Special Agent Michael Fitzgerald of the Federal Bureau of Investigations (FBI) to testify as an expert in neo-Nazi groups. N.T. Excerpt, at 73-76.[5] Agent Fitzgerald based his testimony on his almost twenty-six years in the FBI, his fifteen years investigating domestic terrorism, and his review of Appellant's record prior to the sentencing hearing. N.T. Excerpt, at 70-72, 75, 94. Agent

―――――――――――――――――――――――――

[4] The "Supreme Word" newsletter was a compilation by Appellant containing white supremacist rhetoric and skinhead illustrations by Appellant depicting hanging race traitors (informants); an excerpt from a "martyr for the cause" who died in a gun fight with the FBI; and articles from various neo-Nazi fundamentalists. N.T. Excerpt, at 78-86.

[5] According to Appellant, Agent Fitzgerald was not an expert in Pennsylvania prison gangs, was not qualified to discuss the philosophy espoused in Appellant's newsletter, and his testimony was cumulative to Lieutenant Torres' earlier testimony. N.T. Excerpt, at 75-76.

Fitzgerald testified that, in his expert opinion, should Appellant be released from custody, he would be connected to a network that would make him a danger to the general public and specifically, to Jews, minorities, and law enforcement. N.T. Excerpt, at 94-96.

The Commonwealth called Dr. John O'Brien, a psychiatrist, to testify. N.T. Excerpt, at 99-100. Dr. O'Brien had reviewed an earlier psychiatric evaluation of Appellant but was unable to conduct his own evaluation. N.T. Excerpt, at 100-01.[6] Dr. O'Brien also reviewed Appellant's record, which included a history of fire setting, an incident where Appellant shot a dog, and a history of substance abuse. *Id.* at 106. Based on Dr. O'Brien's review of Appellant's records, he concluded, with a reasonable degree of medical certainty, that Appellant has Anti-Social Personality Disorder ("ASPD"). *Id.* at 101. While Dr. O'Brien noted that ASPD is not treatable, he stated that it could attenuate with age. *Id.* at 113-14. Dr. O'Brien also testified that it is rare to diagnose a person with ASPD and that the number of individuals with ASPD involved in prison gangs is also similarly rare. *Id.* at 116, 119.

Dr. O'Brien was not confident of Appellant's rehabilitation because Appellant merely presented a superficial sense that he can adjust, essentially "flying under the radar" for the previous ten years. *Id.* at 118. Dr. O'Brien

_____

[6] The psychiatric evaluation was originally conducted by Dr. Sadoff on June 16, 1996, before Appellant had originally pleaded guilty. *See* N.T. Excerpt, at 100.

- 6 -

also expressed concern that Appellant would rely on his connections with SPS if released from prison. *Id.* at 119.

Next, the Commonwealth called Appellant's longtime friend, Sherry Flick, to testify. Mrs. Flick testified that she originally connected with Appellant through a mutual friend named Dwayne in 2002. N.T. Sentencing, at 117. Dwayne was one of the men who attempted to aid Appellant in his 2004 escape attempt and was involved in the same prison gang, SPS. *Id.* at 124; N.T. Excerpt, at 15. Mrs. Flick testified that she had a past romantic relationship with Appellant despite being married, although their relationship is now platonic. N.T. Sentencing, at 117, 121. While Mrs. Flick testified that she did not hold the same beliefs as Appellant, she nonetheless helped to copy and distribute copies of Appellant's newsletter, titled "Supreme Word." *Id.* at 126-29. She also testified that around the time of his filing of his PCRA petition, Appellant told her that he no longer identified as a white supremacist as he had become a Christian. *Id.* at 119. Additionally, evidence was presented that, during the course of their fourteen-year relationship, Mrs. Flick had deposited around $10,000 into Appellant's prison account. *Id.* at 117; N.T., 10/18/16, at 81. Following her testimony, the Commonwealth rested its case, reserving the right to recall its experts or rebuttal witnesses.

Three months later, Appellant presented his case. First, Appellant called Dr. Carol Armstrong, a neuropsychologist. Dr. Armstrong acknowledged that she had not reviewed any material on Appellant's case or met with Appellant prior to writing her report. N.T., 10/18/16, at 23. However, Dr. Armstrong

explained the differences between adult and juvenile brains and opined that juveniles are not capable of making future predictions or controlling inappropriate behavior as well as adults. *Id.* at 18-19. Nonetheless, Dr. Armstrong was impeached on cross-examination, and the sentencing court did not find her testimony credible. *Id.* at 60-62; *see also* N.T., 10/19/16, at 64-65.

Next, Appellant presented Dr. William Russell as an expert in forensic psychology. Dr. Russell, in preparing for court, reviewed Dr. Sadoff's report, the sentencing memoranda, the notes of testimony, letters from Lieutenant Michael Torres and the district attorney, and Dr. O'Brien's report. N.T., 10/18/16, at 65, 120. He also met with Appellant twice. *Id.* Based on his review of Appellant's information, Dr. Russell agreed with Dr. O'Brien's ASPD diagnosis but considered Appellant at a low risk for recidivism based on his improved behavior over the past eight years. *Id.* at 78-79, 91. Noting the discrepancies in Appellant's initial reports of the murder, Dr. Russell stated that Appellant is still manipulative. *Id.* at 116-118. By way of example, Dr. Russell referenced Appellant's recent statements that he had embraced Christianity and distanced himself from the prison gang. Dr. Russell contrasted this claim with a transcript of the phone conversation between Appellant and his friend Mrs. Flick on December 26, 2015, during which they discussed putting Jews in ovens. *Id.* at 97-98. Overall, Dr. Russell noted that Appellant had not "lost the concept of race and white supremacy." *Id.* at 96, 125. Dr. Russell also mentioned Appellant's 2004 letter to Mrs. Flick where

Appellant stated, "when I was real little, I wanted a pet monkey. I never thought I would come to prison and have thousands of them, smiley face[.]" *Id.* at 96-97.

Following Dr. Russell's testimony, the Commonwealth recalled Dr. O'Brien, who also discussed transcripts from the 2015 conversation between Appellant and Mrs. Flick. Of significance to Dr. O'Brien was Appellant's comments about putting Mrs. Flick's husband in a shallow grave, which demonstrated that he had ongoing aggressive ideation. N.T., 10/18/16, at 143. Dr. O'Brien also commented on Appellant's prior abuse of his sister, Sherry Hume, when he was a juvenile. N.T., 10/18/16, at 146-47.[7] Dr. O'Brien concluded that Appellant was a rare and uncommon individual who had a poor chance of being rehabilitated. *Id.* at 151, 160-61.[8]

The following day, Appellant exercised his right to allocution. N.T., 10/19/16, at 5-30. Appellant apologized for the pain and loss his actions caused both his and the victim's families. *Id.* at 5, 16, 29. Appellant went on to say that he was an "emotional mess" after the murder. *Id.* at 7. He asserted that he had distanced himself from all gang activity and no longer

---

[7] At the time of Appellant's arrest, his sister, Sherry Hume, reported that her brother had choked her until she turned blue after she had informed him that she was saving the milk he was drinking for another sibling. N.T. Sentencing, at 109-13. Mrs. Hume also testified that Appellant abused his younger siblings. *Id.* at 111.

[8] Prior to this hearing, on October 11, 2016, Dr. O'Brien was able to meet with Appellant and conduct a psychiatric evaluation. N.T., 10/18/19, at 132-33; *see also* Commonwealth's Exhibit 23.

wanted to have racist views. *Id.* at 11, 13. According to Appellant, religion was helping, but he admitted that he still struggled with being a racist and used racial slurs. *Id.* at 13, 15. Appellant stated that he maintained healthy relationships with his family, although he admitted to a strained relationship with his younger sister, who has a multiracial child. *Id.* at 14, 19. Appellant noted positive prison activities in which he was involved, such as: recreational painting and designs; going to the library; obtaining his GED; working two jobs; and he indicated that he is on a waitlist for a peer inmate program. *Id.* at 16, 19, 26.

Appellant also sought to explain why he wanted a gun for his prison escape. *Id.* at 23-25. According to Appellant, it was

> insurance that I would never be put in the hole for the rest of my life … I didn't want a gun for any other reason than that. It's one of them things. I'm glad it was stopped before it ever came to fruition beyond talking and minimal planning and like nobody -- like I didn't make a physical attempt[.]

*Id.* at 24. As a result of his escape attempt, Appellant stated that he rarely sees his family and is restricted in what he can do and the jobs he can hold in prison. *Id.* at 24-25.[9] Appellant rested his case and incorporated again by

---

[9] Appellant's sister testified that the visits from his family are limited to once or twice a year because of the distance Appellant's family has to travel. **See** N.T. Sentencing, at 87.

reference his sentencing memorandum, which had been already admitted into evidence. *Id.* at 4, 42.[10]

> At the conclusion of the hearing, the court stated that:
>
> We also believe that it is the Commonwealth that has the burden of proof beyond a reasonable doubt to establish that this defendant is uncommon and rare and an unusual juvenile who would likely kill in the future, and the public can only be protected by him being incarcerated for the rest of his natural life.
>
> We believe the Commonwealth has met that burden, and we believe that this defendant has earned and has continued to exhibit earning a sentence of life without the possibility of parole.

N.T., 10/19/18, at 67.

After considering the evidence presented, the court sentenced Appellant to life without parole. *Id.* at 67-68. Appellant timely filed a motion to modify his sentence, which was denied. Appellant timely appealed and filed a court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued a responsive opinion.

On appeal, Appellant raises the following issues:

---

[10] On appeal, during oral arguments, on May 3, 2018, this Court asked Appellant to point out in the record, specifically, what conduct related to Appellant's rehabilitation over his twenty-year incarceration. However, Appellant could not adequately provide an answer. On May 17, 2018, Appellant filed an Application for Post-Submission Communication explicitly directing this Court's attention to places in the record that indicated Appellant's rehabilitation. More specifically, Appellant directed this Court's attention to various letters of support from African-American inmates, proof of achievements and certificates, and accommodations from various employers at the prison. Thus, we grant Appellant's application for Post-Submission Communication.

1. Did the trial court violate the First and Fourteenth Amendments of the U.S. Constitution and Article 1 Section 7 of the Pennsylvania Constitutional in admitting evidence, over objection, regarding Appellant's affiliation with the State Prison Skinheads and other references to Appellant's White Supremacists beliefs when the Commonwealth presented no evidence of actions by Appellant that would make these beliefs or affiliations relevant to the matter before the court?

2. Did the trial court err in allowing the expert testimony of Special Agent James Fitzgerald over objection of counsel?

3. Does Appellant's sentence violate the constitutional mandate articulated by the U.S. Supreme Court in **Miller v. Alabama**, 132 S. Ct. 2455 (2012)[,] and **Montgomery v. Louisiana**, 136 S. Ct. 718 (2016)[,] that life without parole sentences should be "unusual" or "rare" and reserved only for those who are "permanently incorrigible, irreparably corrupt, or irretrievably depraved"?

   a. Is the instant case one of the "unusual" or "rare" cases permitting such a sentence?

   b. Did the trial court make a finding supported by competent evidence that appellant is "permanently incorrigible, irreparable corrupt or irretrievably depraved"?

4. Did the Commonwealth meet its burden of proof beyond a reasonable doubt to justify a life without parole sentence?

5. Did the trial court err in not giving appropriate consideration and weight to the **Miller** sentencing factors that counsel against imposing the harshest sentence on a juvenile

   a. Did the trial court improperly abuse its discretion in imposing an excessive or unreasonable sentence of life without parole by failing to adequately and appropriately consider Appellant's ability to be rehabilitated as required by **Miller** and **Montgomery**?

6. Did the trial court incorrectly rely upon the antisocial personality disorder diagnosis in concluding that Appellant's approximately twenty year prison history supported a prediction of future dangerousness while the diagnosis itself includes a diminution of criminal behavior as an individual ages?

7. Did the trial court err in denying Appellant's continuance request of July 26, 2016 sentencing hearing when the defense did not have

adequate time to procure expert review of the Commonwealth's proffered expert testimony?

**See** Appellant's Brief at 6-7 (capitalization omitted; issues renumbered for ease of disposition).

### Evidentiary Issues

We will begin by addressing Appellant's evidentiary issues, as they lay the foundation for Appellant's argument challenging his resentencing to life without parole as a juvenile.

The standard for reviewing the admission of evidence is an abuse of discretion. **Commonwealth v. King**, 182 A.3d 449, 454 (Pa. Super. 2018). In particular, it is well settled that a court has abused its discretion if "the record disclosed that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." **Id.** at 454 (quoting **Commonwealth v. Smith**, 673 A.2d 893, 895 (Pa. 1996)).

Appellant contends that the trial court violated his First and Fourteenth Amendment rights by admitting evidence of his affiliations with SPS and his white supremacist beliefs. **See** Appellant's Brief at 58 (citing to **Delaware v. Dawson**, 503 U.S. 159 (1992)). According to Appellant, his affiliations were not relevant to the sentencing court's consideration. **Id.** Appellant argues that the only evidence presented was of his ideology and there was no nexus between Appellant's ideology and violent criminal acts. **Id.** at 59. Appellant asserts that the Commonwealth used his affiliation with SPS to make a "speculative leap to projected future dangerousness." **Id.** Thus, Appellant

concludes that such irrelevant evidence was not a permissible sentencing consideration and prejudiced him. *Id.* at 58.

As mentioned *supra*, the admission of evidence during sentencing is in the sound discretion of the court and will not be disturbed absent an abuse of discretion. *King*, 182 A.3d at 454-55. The court can consider any evidence it deems relevant, as it is "neither bound by the same rules of evidence nor criminal procedure as it is in a criminal trial." *Id.* at 455. This includes all evidence relating to any aggravating or mitigating factor. *Commonwealth v. Young*, 637 A.2d 1313, 1321-22 (Pa. 1993). Thus, reversal of the decision requires a finding of an abuse of discretion and prejudice. *Commonwealth v. Franklin*, 580 A.2d 25, 31 (1990).

In *Dawson*, during sentencing, the prosecution and the defendant's attorney stipulated that Dawson was a member of the Aryan Brotherhood, a white supremacist prison gang. *Dawson*, 112 S. Ct. at 1096. In return for the stipulation, the prosecution agreed not to call any expert witnesses to testify regarding the Aryan Brotherhood. *Id.* The Supreme Court held that the stipulation was a constitutional error because the narrowness of the stipulation lacked context and was "totally without relevance" to Dawson's sentencing. *Id.* at 1098. No evidence had been introduced regarding the Aryan Brotherhood's unlawful or violent acts, and the evidence was not relevant to rebut any mitigating evidence offered by Dawson. *Id.* However, the Supreme Court noted that if there was relevant evidence connecting the Aryan Brotherhood's violent acts to the defendant, such evidence may have

- 14 -

been admissible; there is no *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing merely because the First Amendment protects such beliefs. *Id.* at 1097-98. The ***Dawson*** Court provided examples of why a defendant's gang affiliations would be relevant admissible evidence, such as establishing a potential future dangerousness, and rebut mitigation or character evidence. *Id.* at 1098.

The instant case is easily distinguishable from ***Dawson***, and Appellant's argument that his gang affiliations were not relevant to his sentencing consideration is without merit. Here, the information regarding Appellant's affiliation with SPS was introduced at sentencing to establish Appellant's future dangerousness and potential for rehabilitation. N.T., 1/26/16, at 94-96; ***see also*** TCO, 5/25/17, at 12-13. Agent Fitzgerald testified regarding white supremacist gangs, their far reach, and their violent acts. N.T. Excerpt 7/26/16, at 70-99. The Commonwealth presented evidence that: (1) Appellant was still in contact with gang members and associates; (2) members of the gang had plotted to acquire Appellant a gun for use in his escape attempt; (3) Appellant had made threats against the lives of specific individuals; and (4) the ideology of the gang particularly espouses a rhetoric of violence against Jews, other minorities, and law enforcement. ***See*** N.T. Sentencing, at 117; ***see also*** N.T Excerpt, at 15-19, 28-33. At Appellant's sentencing, he admitted he still holds racist beliefs. N.T., 10/19/16, at 13. Thus, the information regarding SPS was appropriately considered to counter Appellant's claim that he was rehabilitated, and no longer presented a danger

to the public, and was not a violation of his First or Fourteenth Amendment rights. *See e.g., Dawson*, 112 S. Ct. at 1097. Therefore, the sentencing court did not abuse its discretion in admitting this evidence. *King*, 182 A.3d at 454-55; *Young*, 637 A.2d at 1321-22; *Franklin*, 580 A.2d at 25.

Appellant also asserts that the court erred in allowing the expert testimony of Special Agent Fitzgerald. *See* Appellant's Brief at 60.[11] According to Appellant, Agent Fitzgerald has never: (1) testified "as an expert in any courtroom"; (2) published any academic studies involving gangs; or (3) been qualified as an expert in prison gangs or the Pennsylvania prison system. *Id.* Thus, Appellant concludes that Agent Fitzgerald should not have been permitted to testify as an expert in prison gangs in the Pennsylvania Prison system. *Id.*

Pennsylvania has long maintained a liberal standard for admitting expert testimony:

> The qualification of an expert witness rests within the sound discretion of the trial judge, and absent an abuse of discretion, the decision of the trial judge should be upheld. "It is well established in this Commonwealth that the standard for

---

[11] In support of his argument, Appellant cites to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923. The *Frye* court held that in order for scientific, expert testimony to be admissible, the methodology relied upon must have gained general acceptance in the field to which it belongs. *Frye*, 293 F. at 1013. *See* Appellant's Brief at 60. *Frye* is not relevant to this issue because the expert testimony was not novel, and Appellant is not challenging Agent Fitzgerald's background as an FBI agent, which formed the basis of his expert deductions. In fact, there was no argument made that Agent Fitzgerald's training and background was not widely accepted by those in law enforcement, especially in the FBI.

qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine." It is also well-established that a witness does not need formal education on the subject matter of the testimony, and may be qualified to render an expert opinion based on training and experience.

*Commonwealth v. Wallace*, 817 A.2d 485, 494 (Pa. Super. 2002) (quoting *Miller v. Brass Rail Tavern*, 664 A.2d 525, 528 (Pa.1995)) (internal citations omitted); *see also* Pa.R.E. 702 (stating testimony is allowed if "(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson; (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and (c) the expert's methodology is generally accepted in the relevant field.").

Here, the sentencing court allowed Agent Fitzgerald to testify as an expert in neo-Nazi groups. N.T Excerpt, at 73-74. Agent Fitzgerald had been in the FBI for approximately twenty-six years, fifteen of which were spent investigating domestic terrorism, including white supremacist groups. *Id.* at 70, 75. Agent Fitzgerald was a certified undercover agent and had gone under cover in white supremacist and neo-Nazi groups. *Id.* at 71-72.

Thus, because Agent Fitzgerald had specialized knowledge beyond the average layperson and this knowledge would help the fact-finder understand white supremacist gangs, the sentencing court did not abuse its discretion in qualifying him as an expert. *Wallace*, 817 A.2d at 495; Pa.R.E. 702.

## Appropriate Constitutional Standard

With these evidentiary issues resolved, we turn to Appellant's sentencing claims. Appellant contends that the sentencing court violated the constitutional mandates articulated in **Miller v. Alabama**, 132 S. Ct. 2455 (2012), and **Montgomery v. Louisiana**, 136 S. Ct. 718 (2016), namely, that life without parole sentences for juveniles should be unusual, rare, and reserved only for those who are permanently incorrigible, irreparably corrupt, or irretrievably depraved. **See** Appellant's Brief at 22.[12] Appellant suggests that he is capable of rehabilitation and specifically notes the sentencing court's recognition that he has learned "at least to some extent, to comport his behavior in prison." **Id.** at 31 (quoting N.T., 10/19/16, at 61). Thus, Appellant concludes, his case is not one of the unusual or rare cases permitting such a sentence, and the sentencing court did not make a finding supported by competent evidence that Appellant is permanently incorrigible, irreparably corrupt, or irretrievably depraved. **Id.**

> Under **Miller** and **Montgomery**[ **v. Louisiana**, ––– U.S. –––, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016)], a sentencing court has no discretion to sentence a juvenile offender to life without parole unless it finds that the defendant is one of the "rare" and "uncommon" children possessing the above-stated

---

[12] In this section of Appellant's brief, he summarizes all of his arguments on appeal. As Appellant raises these same issues later in his brief, they will not be addressed in Appellant's first issue.

characteristics[13], permitting its imposition. ***Montgomery***, 136 S.Ct. at 726, 734; ***Miller***, 567 U.S. at 479, 132 S. Ct. 2455; ***see Graham***, 560 U.S. at 73, 130 S.Ct. 2011; ***Roper***[ ***v. Simmons***], 543 U.S. [551,] 572–73, 125 S.Ct. 1183, 161 L.Ed.2d 1 [ (2005) ]. A sentence of life in prison without the possibility of parole for a murder committed when the defendant was a juvenile is otherwise disproportionate and unconstitutional under the Eighth Amendment. ***Montgomery***, 136 S.Ct. at 734, 735.

Thus, in the absence of the sentencing court reaching a conclusion, supported by competent evidence, that the defendant will forever be incorrigible, without any hope for rehabilitation, a life-without-parole sentence imposed on a juvenile is illegal, as it is beyond the court's power to impose. ***See*** [***Commonwealth v.***] ***Vasquez***, 560 Pa. 381, 744 A.2d [1280,] 1282 [ (2000) ]; [***Commonwealth v.***] ***Shiffler***, 583 Pa. 478, 879 A.2d [185] 189 [ (2005) ]; ***In re M.W.***, 555 Pa. 505, 725 A.2d [729,] 731 [ (1999) ]. As stated by the ***Montgomery*** Court, "when a State enforces a proscription or penalty barred by the Constitution, the resulting conviction or sentence is, by definition, unlawful." ***Montgomery***, 136 S.Ct. at 729–30. As such, we must review the sentencing court's legal conclusion that Batts is eligible to receive a sentence of life without parole pursuant to a *de novo* standard and plenary scope of review. ***Commonwealth v. McClintic***, 589 Pa. 465, 909 A.2d 1241, 1245 (2006). Because this legal conclusion is premised upon the presentation of testimony and the sentencing court's credibility determinations, it presents a mixed question of fact and law. In such circumstances, we defer to the findings of fact made by the sentencing court as long as they are supported by competent evidence, but give no deference to that court's legal conclusions. ***Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. John***, 630 Pa. 1, 106 A.3d 1, 13 (2014); ***Commonwealth v. James***, 620 Pa. 465, 69 A.3d 180, 186 (2013); ***Commonwealth v. Spotz***, 610 Pa. 17, 18 A.3d 244, 259 (2011); ***In re Condemnation by Urban Redevelopment Auth. of Pittsburgh***, 590 Pa. 431, 913 A.2d 178, 183 (2006).

_____

[13] A sentence of life without parole for a juvenile is permissible only if the "crime was not the result of the 'unfortunate yet transient immaturity' endemic of all juveniles." ***Commonwealth v. Batts***, 163 A.3d 410, 435 (Pa. 2017).

*Commonwealth v. Coia*, 168 A.3d 219, 222–23 (Pa. Super. 2017) (quoting

*Batts II*, 163 A.3d 410, 435-36 (Pa. 2017)).

A faithful application of *Miller* and *Montgomery* "requires the creation

of a presumption against sentencing a juvenile offender to life in prison

without the possibility of parole." *Batts II*, 163 A.3d at 452; *see also Coia*,

168 A.3d at 223.[14] The burden of rebutting this presumption is placed upon

the Commonwealth. *Batts II*, 163 A.3d at 459. Finally, to rebut the

presumption, the Commonwealth must prove, "beyond a reasonable doubt,

that the juvenile offender is permanently incorrigible and thus is unable to be

rehabilitated." *Id.*

While the sentencing court did not use the specific language of *Miller*,

stating that Appellant was "irretrievab[ly] deprav[ed,]" it is clear that the court

was referring to Appellant's lack of rehabilitation potential. *Miller*, 132 S. Ct.

at 2458. The court recognized the burden was on the Commonwealth. N.T.,

10/19/16, at 67. The sentencing court concluded that the Commonwealth had

_____

[14] In *Coia*, the defendant was sentenced prior to the Pennsylvania Supreme
Court's decision in *Batts II*. *Coia*, 168 A.3d at 224. Thus, our Court vacated
his sentence, remanded for reconsideration with the later-established
presumption against the imposition of a life without parole sentence for a
juvenile offender, and required the Commonwealth to rebut the presumption
with evidence establishing beyond a reasonable doubt that the defendant was
permanently incorrigible and unable to be rehabilitated. *Id.* In the instant
case, although Appellant was sentenced while *Batts II* was pending on
appeal, the parties stipulated, prior to resentencing, that there was a
presumption against life sentences without the possibility of parole and that
the Commonwealth must prove its case beyond a reasonable doubt. *See* N.T.
7/25/16, at 7-8. Accordingly, a remand is unnecessary.

met its burden to establish that Appellant was a "rare and uncommon" child.

*Id.* During the sentencing, the court noted:

> We also believe that it is the Commonwealth that has the burden of proof beyond a reasonable doubt to establish that this defendant is uncommon and rare and an unusual juvenile who would likely kill in the future, and the public can only be protected by him being incarcerated for the rest of his natural life.
>
> We believe the Commonwealth has met that burden, and we believe that this defendant has earned and has continued to exhibit earning a sentence of life without the possibility of parole.

N.T., 10/19/18, at 67. The court applied the correct standard. Thus, Appellant's claim is specious and without merit, and Appellant is not entitled to relief. *Coia*, 168 A.3d 219 at 222-23.

### The Sufficiency of the Commonwealth's Evidence

In a related claim, Appellant asserts that the Commonwealth failed to meet its burden to prove beyond a reasonable doubt that a life sentence without parole was justified. *See* Appellant's Brief at 47-50. Specifically, Appellant argues that the Commonwealth did not establish that he was beyond rehabilitation. *Id.* According to Appellant, Dr. O'Brien's testimony was ambivalent. Appellant argues that Dr. O'Brien stated that Appellant had a "documented capability of performing at work and … meeting the programmatic needs[,]" but that his "rehabilitative potential is in my opinion hard to glean[.]" *Id.* at 48. Appellant further contends that Dr. O'Brien's conclusion was based on speculation rather that the "subjective state of certitude" required by the reasonable doubt standard. *Id.* at 49. According

to Appellant, there was evidence of Appellant's ability to be rehabilitated. *Id.* at 49-50. For example, Appellant states he could be rehabilitated because he had met the qualifications for and was granted an incentive-based transfer. *Id.*[15] Thus, Appellant concludes that the Commonwealth did not present competent evidence of Appellant's lack of rehabilitative potential beyond a reasonable doubt. *Id.*

Essentially, Appellant challenges the sufficiency of the Commonwealth's evidence, which presents a question of law.

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted). Therefore, our standard of review is *de novo*, and the

---

[15] An incentive-based transfer allows an inmate to be transferred closer to his home region. *See* Appellant's Exhibit 1, tab 41; *see also* Appellant's Brief at 49-50. In order for an inmate serving a life sentence to qualify for a transfer, the inmates must have: (1) been compliant with their Correctional plan; (2) maintained a Level 3 Custody Level; (3) have no Class 1 or Class 2 misconducts within the prescribed time period; (4) have completed ten years of their sentence; and (5) have a period of ten years of overall positive adjustment. *Id.* The requirements also state that if an inmate fails to maintain the incentive-based requirements, he will be transferred away from his home region. *Id.*

scope of review is plenary. ***Commonwealth v. Delgros***, 183 A.3d 352, 356 (Pa. 2018).

Here, Appellant does not accurately represent the testimony of Dr. O'Brien. In fact, Dr. O'Brien stated that from his review of Appellant's record, Appellant presented a "superficial sense" of rehabilitation which is why he determined that Appellant's rehabilitative potential was "hard to glean[.]" N.T. Excerpt, at 118. Dr. O'Brien clarified that Appellant's behavior had shifted from individualized ASPD to institutionalized ASPD. ***See*** N.T. Excerpt, at 112-13. According to Dr. O'Brien, Appellant is better able to conceal and manipulate his disability and "direct others to do his dirty work." ***Id.*** at 113. Dr. O'Brien opined that this was consistent with Appellant's "intelligence and Antisocial Personality Disorder diagnosis." ***Id.*** at 112. Further, Dr. O'Brien testified that with Appellant's shift into organized antisocial behavior, he is able to shift from acts of violence to other types of criminal activity. ***Id.*** at 117-18.

After this initial testimony, Dr. O'Brien personally examined Appellant on October 11, 2016. N.T., 10/18/16, at 132-33. Based on this examination, Dr. O'Brien further clarified his original statements:

> [Appellant's] profile predisposes him to interpersonal difficulty because it adversely influences rehabilitation efforts – interpersonal difficulties that could adversely influence rehabilitation efforts. He was also identified as an individual who would not be very receptive to suggestions from others and resistant to treatment, and indicated that if he were pressured into therapy by outside circumstances, his cooperation would tend to be minimal … personality disorders and antisocial disorders do attenuate to a certain degree with age, but there's some variation

in that. But the bottom line is that [Appellant]'s testing reveals ongoing symptoms consistent with that diagnosis.

*Id.* at 150-51; *see also* Commonwealth's Exhibit 23 and 24 (Dr. O'Brien's Report and results from Appellant's tests respectively). Dr. O'Brien concluded with a reasonable degree of medical certainty Appellant's chances of being rehabilitated is poor and that he was a rare and uncommon juvenile. *Id.* at 151, 160-61. Thus, Appellant's claim that Dr. O'Brien's testimony did not meet the required burden of proof is not persuasive, in light of the entire record of Dr. O'Brien's testimony. *Widmer*, 744 A.2d at 751. Therefore, as a matter of law, Dr. O'Brien's testimony was sufficient. *Id.*

Further, Appellant's main argument in support of Appellant's rehabilitative potential was the grant of his incentive-based transfer request on May 10, 2016. Appellant's Brief at 49-50; *see also* Appellant's Exhibit 1, tab 43. However, Appellant fails to mention that this transfer grant was revoked due to Appellant's misconduct on October 11, 2016, one week prior to the second portion of his sentencing hearing. N.T., 10/18/16, at 166-67. Additionally, even if Appellant's argument was credible, this evidence goes to an argument against the weight of the evidence and not to the sufficiency of the evidence. *See, e.g., Commonwealth v. Crosley*, 180 A.3d 761, 768 n.2 (Pa. Super. 2018).

**The Discretionary Aspects of Appellant's Sentence**

Appellant raises two, interrelated arguments challenging the discretionary aspects of his sentence. Accordingly, we shall address them

together. Appellant claims that the trial court did not give the appropriate consideration and weight to the *Miller* sentencing factors. *See* Appellant's Brief at 43. According to Appellant, the sentencing court: (1) improperly allowed the nature of the crime and past conduct to drive the sentence; (2) did not consider Appellant's upbringing; (3) failed to consider evidence of Appellant's rehabilitation; and (4) improperly relied on Appellant's ASPD diagnosis as a predictor for future dangerousness without considering the possible attenuation of criminal behavior. *Id.* at 43-44, 51.

> In the instant case, Appellant
>
> challenges the discretionary aspects of sentencing for which there is no automatic right to appeal. This appeal is, therefore, more appropriately considered a petition for allowance of appeal. Two requirements must be met before a challenge to the judgment of sentence will be heard on the merits. First, the appellant must set forth in his [or her] brief a concise statement of matters relied upon for allowance of appeal with respect to the discretionary aspects of his [or her] sentence. Pa.R.A.P. 2119(f). Second, he or she must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code. 42 Pa.C.S.A. § 9781(b)[.]
>
> The determination of whether a particular case raises a substantial question is to be evaluated on a case-by-case basis. Generally, however, in order to establish that there is a substantial question, the appellant must show actions by the sentencing court inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing process.

*Commonwealth. v. Seagraves*, 103 A.3d 839, 841 (Pa. Super. 2014) (quoting *Commonwealth v. Marts*, 889 A.2d 608, 610-11 (Pa. Super. 2005)). In addition to filing these requirements, an appellant must have timely appealed and preserved the issues on appeal. *King*, 182 A.2d at 453.

- 25 -

Here, Appellant has timely appealed, preserved his issues on appeal through a post-sentence motion to modify his sentence, and filed a proper 2119(f) statement. Thus, we must determine if Appellant has raised a substantial question. *Seagraves*, 103 A.3d at 841-42 ( stating "[i]n reviewing a challenge to the discretionary aspects of sentencing, we evaluate the court's decision under an abuse of discretion standard.") (quoting *Dodge*, 77 A.3d at 1274).

"We are, of course, mindful that it is apparent that this Court's determination of whether an appellant has presented a substantial question in various cases has been less than a model of clarity and consistency, even in matters not involving excessive sentence claims." *Commonwealth v. Dodge*, 77 A.3d 1263, 1272 n. 8 (Pa. Super. 2013). Nevertheless we have recognized a distinction between a sentencing court's failure to consider the factors required by law, in this case as outlined by *Miller*, and allegations that the court has failed to properly *weigh these factors*. *Id.* For example, allegations that the sentencing court failed to consider the *Miller* factors raises a substantial question. *Seagraves*, 103 A.3d at 842. However, an argument that the court failed to "adequately" consider the mitigating evidence does not raise a substantial question. *Dodge*, 77 A.3d at 1272.

Here, Appellant states that

[t]he sentencing court considered the nature of the crime and past conduct primarily in determining the sentence. Rather, Appellant asserts that the court erred in not adequately and appropriately considering Appellant's ability to be rehabilitated as required by the *Miller* and *Montgomery* Supreme Court decisions.

Appellant's Brief at 19. Unlike in **Seagraves**, Appellant does not assert the **Miller** factors were ignored, rather Appellant asserts that the court failed to adequately consider those factors. **Id.** Thus, Appellant's argument, that the sentencing court did not adequately consider Appellant's ability to be rehabilitated, does not present a substantial question and does not warrant a review on the merits of Appellant's argument. **Dodge**, 77 A.3d at 1272 n. 8.

Nevertheless, the record supports that the sentencing court properly considered the **Miller** factors. N.T., 10/18/16, at 67; **see also** TCO 5/25/17, at 6. The court had access to an extensive sentencing memorandum provided by Appellant, which included significant mitigating factors and the court made specific mention of his review of these on the record. N.T., 10/19/16, at 66. Additionally, to the extent Appellant challenges the court's reliance on Appellant's ASPD diagnosis, we note that the court is free to rely on evidence of a defendant's mental health. **See e.g., Miller**, 132 S. Ct. at 2467 (quoting **Eddings v. Oklahoma**, 102 S. Ct. 869, 877 (2012) (stating that "just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered")); **Batts II**, 163 A.3d at 422-24 (discussing expert testimony concerning defendant's mental health); **Seagraves**, 103 A.3d at 850 (referencing the relevance of a defendant's mental health history). Thus, even if we were to recognize that Appellant presented a substantial question, we discern no abuse in the court's discretion

in sentencing Appellant. *Dodge*, 77 A.3d at 1274; *Seagraves*, 103 A.3d at 842.

**Request for Continuance**

Finally, Appellant claims that the court erred in denying his request to continue the July 26, 2016 sentencing hearing. *See* Appellant's Brief at 62. According to Appellant, the Commonwealth belatedly notified him of its intention to introduce expert testimony. *Id.* Appellant suggests that the last minute addition of expert testimony did not afford him adequate time to prepare a response. *Id.* Appellant's claim is without merit.

Our Court has held that a sentencing court's decision to deny a continuance request will be overturned if "prejudice or a palpable and manifest abuse of discretion is demonstrated." *Commonwealth v. Pries*, 861 A.2d 951, 953 (Pa. Super. 2004) (citing *Commonwealth v. Griffin*, 804 A.2d 1, 12 (Pa. Super. 2002). Further,

> [a]n appellant must be able to show specifically in what manner he was unable to prepare his defense or how he would have prepared differently had he been given more time. We will not reverse a denial of a motion for continuance in the absence of prejudice.

*Commonwealth v. Ross*, 57 A.3d 85, 91 (Pa. Super. 2012) (citing *Commonwealth v. Brown*, 505 A.2d 295, 298 (Pa. Super. 1986).

Here, the record does not support Appellant's assertion. Essentially the sentencing court did grant Appellant's continuance request. *See* N.T, 7/25/16, at 29-30. Although the court declined to postpone the

Commonwealth's presentation of its case, it gave Appellant three months to acquire experts and prepare a response. Appellant also conceded that he would be amenable to having the Commonwealth present its case, if he could receive "a very lengthy adjournment from tomorrow until the next time we call experts." *Id.* at 10. Further, Appellant was able to cross-examine Commonwealth's main expert, Dr. O'Brien, a second time during the October portion of Appellant's sentencing hearing. N.T., 10/18/16, at 161. Additionally, Appellant was able to secure Dr. Russell as an expert witness, who met with Appellant twice in the interim, three-month period.

Thus, we conclude that Appellant's argument is devoid of merit. Appellant has not shown that he was prejudiced by the continuance and is not entitled to relief. *Ross*, 57 A.3d at 91.

Application for Post-Submission Communication granted; judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/18

- 29 -